Jonathan A. Dessaules (019439)
David E. Wood (021403)
**DESSAULES LAW GROUP**
7243 North 16th Street
Phoenix, Arizona 85020
602.274.5400 tel.
602.274.5401 fax
jdessaules@dessauleslaw.com
dwood@dessauleslaw.com

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Cameron Threadgill; Oliver Christy; and Jake Orzalli, | No. |
| Plaintiffs, | **VERIFIED COMPLAINT (CLASS ACTION)** |
| vs. | **Jury Trial Demanded** |
| Saddlebrook Investments, LLC, a Montana limited liability company; Stuart Simonsen and Doe Simonsen; All Done Consulting, LLC, a Minnesota limited liability company; Ryan Morgan and Doe Morgan; and Jeff Mitchell, | |
| Defendants. | |

Plaintiffs Cameron Threadgill, Oliver Christy, and Jake Orzalli, on behalf of themselves individually and on behalf of those similarly situated, allege the following:

## PRELIMINARY STATEMENT

Plaintiffs bring this class action on behalf of all current and past investors with Saddlebrook Investments and/or All Done Consulting who invested money through Saddlebrook Investments and/or All Done Consulting's claimed Service Agreements for Shopify stores as those services were unregistered securities and solicited through false and misleading statements in violation of federal securities laws, sold through false and misleading statements in violation of Arizona Consumer Fraud statutes, and contracts with terms not fulfilled as promised.

**PARTIES, JURISDICTION AND VENUE**

1.    Plaintiff Cameron Threadgill ("Threadgill") resides in Maricopa County, Arizona.

2.    Plaintiff Jake Orzalli ("Orzalli") resides in Travis County, Texas.

3.    Plaintiff Oliver Christy ("Christy") resides in Williamson County, Texas.

4.    Defendant Saddlebrook Investments, LLC ("Saddlebrook"), upon information and belief, is a foreign limited liability company doing business in, but not authorized to do business in, Maricopa County, Arizona.

5.    Defendant All Done Consulting, LLC ("ADC"), falsely held itself out as an Arizona limited liability company. Defendant ADC publicly lists its business address as 6815 E. Camelback Road Apartment 3003, Scottsdale, Arizona 85251 and lists a business phone number with a "480" area code. A "Ryan Morgan" is listed as the manager of ADC as a registered limited liability corporation in Minnesota.  Defendant ADC is doing business in, but not authorized to do business in, Maricopa County, Arizona.

6.    Defendant Ryan Morgan ("Morgan"), upon information and belief, is a resident of Maricopa County, Arizona and who conducts business as ADC, or is otherwise the alter ego of ADC, in Maricopa County, Arizona. Doe Morgan is the unknown spouse of Defendant Morgan. Doe Morgan is named in this action because all acts alleged herein with respect to Morgan were undertaken for the purpose of benefiting, and did benefit, Morgan's marital community, if any. Plaintiffs will seek leave to amend this Complaint once Doe Morgan's real name is discovered.

7.    Defendant Stuart Simonsen ("Simonsen") is a resident of Montana who represents himself as the CEO, owner, manager, and founder of Defendant Saddlebrook. Defendant Simonsen has done business in Maricopa County, Arizona through the acts identified herein. Doe Simonsen is the unknown spouse of Defendant Simonsen. Doe Simonsen is named in this action because all acts alleged herein with respect to Simonsen were undertaken for the purpose of benefiting, and did benefit, Simonsen's marital community, if any. Plaintiffs will seek leave to amend this Complaint once Doe Simonsen's real name is discovered.

2

8.      Defendant Jeff Mitchell ("Mitchell"), upon information and belief, is a resident of Nashville, Tennessee who holds himself out as a partner or salesmen for Defendants ADC, Saddlebrook, and Simonsen.

9.      The parties entered into the contract/investment contracts that are the subject of this action in Maricopa County, Arizona. The representations alleged herein were made and had their intended effect in Maricopa County, Arizona.

10.      This action arises under 15 U.S.C. § 78a, *et seq.*, and 17 C.F.R. § 240.10b-5, governing the terms and conditions pursuant to which clients enter and agree in Service Agreements with Defendants solicited through interstate commerce.

11.      Jurisdiction is proper in this Court under 28 U.S.C. §§ 1331 and 1337. This Court has supplemental jurisdiction over Plaintiffs' state law claim pursuant to 28 U.S.C. § 1367.

12.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b). Defendant ADC claims to have an office in Maricopa County, Arizona, and does in fact conduct most or all its business operations from that location, including but not limited to soliciting clients for Service Agreements and performing the business functions agreed to with Defendant Saddlebrook as part of those Service Agreements. Defendant Morgan is a resident of Maricopa County, Arizona. Plaintiff Threadgill is a resident of Maricopa County, Arizona.

**DEFENDANTS AGGRESSIVELY SEEK INVESTORS WITH CLAIMS OF LUCRATIVE, OPERATING, PROVEN OPPORTUNITY**

13.      Defendants acted in concert to solicit funds for contracts they drafted and titled as "Service Agreements" to fund, create, and run for passive investors online stores hosted on the Shopify platform. [Exhs. 1, 2, 3]

14.      Shopify is an online business that allows any user to easily create a web store and conduct sales through both the web store and various internet applications. Shopify also has a system for users to start a drop shipping site simply and easily by connecting with third parties to house and ship inventory for sale.

15.     Those Service Agreement contracts designated Defendant Sadlebrook as the "Service Provider" and Defendant ADC as the "Broker." [*Id.*]

16.     The terms of the Service Agreement provided that Saddlebrook as the Service Provider would perform the following services for the start-up and operation of an online business on the Shopify website:

1. Services to be Performed. Service Provider shall provide the following services to Client (the "Services"):

(a) Store Creation: Service Provider shall create an Account on the "Shopify" website and the "Shopify POS website" (the "Shopify Account") in order to sell goods and/or services online to customers (the "Business"). Client shall be the Joint Venture owner of such Shopify Account. Client shall have accounting access at all times during the course of this Agreement to the Shopify Account.

(b) Advertising and Marketing: Service Provider shall create and execute on behalf of the Business a continuous social media advertising campaign on sites including, but not limited to, Facebook, TikTok, and Instagram. Such advertising and marketing campaign shall be subject to the approval of the Service Provider, at the Service Provider's sole discretion.

(c) Fulfillment: Service Provider shall be responsible for all aspects of transactions with customers for the Business, including providing all public-facing contact information for the Business, a refund policy, and order fulfillment timelines on the Shopify Store. Service Provider shall be responsible for authorizing the charge to the customer with respect of the customer's purchase, refunds, returns, fulfilling any sales or customer service, fraudulent transactions, required legal disclosures, regulatory compliance, alleged or actual violation of applicable laws (including but not limited to consumer protection laws in any jurisdiction where the Business offers products or services for sale), or breach of the Shopify Terms of Service.

(d) Financial Management: Service Provider shall be responsible for the day-to-day management of all aspects of the operation of the Business. Specifically, the Service Provider is solely responsible for determining, collecting, withholding, reporting, and remitting applicable taxes, duties, fees, surcharges, and additional charges that arise from or as a result of any sale on the Shopify Store or the Business' use of the

#.  Shopify Services.

(e) Client Communication: Service Provider shall ensure the Client's access to the Shopify Account and shall provide monthly comprehensive reports, on a timely basis, regarding all aspects of the Business including, but not limited to, advertising, operations, and finances.

Service provider is specifically responsible for the payment of all services performed under this Agreement including all fees applicable to the Shopify Account.

4

17.    In that Service Agreement, ADC, labeled the Broker, was responsible for "the initial sale, ongoing client support, profit distributions and servicing any client needs within a reasonable timeframe." [*Id.*]

18.    The investor, which the Service Agreement labeled the "Client," was barred from materially participating in the store creation, advertising and marketing, fulfillment, and financial management of the Store. "Client shall not control the details, manner, or means by which Service Provider performs the Services in any material respect." [*Id.*]

19.    The purchase or investment sum for the investors was either $35,000 or $40,000. Each Service Agreement provided that Saddlebrook would be monthly paid 45% of the net profit as calculated total revenue less the monthly costs borne by the Client.

20.    Upon information and belief, Defendants directed the clients to initially remit the investment to an account controlled by Defendants ADC and Morgan. Thereafter, upon information and belief, Defendants ADC and Morgan transmitted the investment funds (minus their commission) to Defendants Saddlebrook and Simonsen. Such information and belief is supported by the wiring instructions provided to an investor identifying Defendant ADC as the account owner and Defendant Morgan's assertions and account statements demonstrating that he transmitted more than $400,000 to Defendants Saddlebrook and Simonsen.

21.    The Service Agreement had alternating versions of a Buy Back agreement that Defendants used to induce these purchases/investments. In both versions of the Buy Back agreement, Defendants agreed that if the Client was "dissatisfied with the performance of the Store developed by the Service Provider or the quality of the service provided by the Service Provider or Broker," the Client could upon requisite notice to terminate the Service Agreement and receive back the initial payment less any previously distributed profits. [Exhs. 1, 2] In one version of the Buy Back agreement, it provided that "Broker shall provide to client a refund." [Exh. 1] In a different version of the Buy Back agreement, it provided that "The Broker and/or Service provider shall provide to Client [] a refund." [Exh. 2]

22.    The Service Agreement in one form contained a provision that it would be interpreted pursuant to Texas Law and another form providing that it would be interpreted pursuant to Montana Law. [Exhs. 1, 2]

23.    In both forms, the Service Agreement provides that "If Client is required to bring any action at law or in equity to enforce or interpret the provisions of this Agreement, it shall be entitled to reasonable attorney's fees in addition to any other relief available." [Exhs. 1, 2]

24.    Defendants are not registered with FINRA or the State of Arizona as securities salesmen. Defendants did not register the Service Agreements with either the SEC or the State of Arizona as securities for offering and sale.

25.    Defendants employed agents to: locate potential investors on online media platforms to enter a Service Agreement contract with both Defendants Saddlebrook and ADC, and call potential investors who responded to Defendants' website solicitations to enter a Service Agreement contract with both Defendants Saddlebrook and ADC.

26.    Defendants maintained public web page solicitations for any person to pay $35,000 (later, $40,000) to enter a "Service Agreement" contract with both Saddlebrook and ADC. On those web pages, Defendants referred to the service as providing the opportunity "to become a 70/30 partner on an ecommerce brand created on Shopify." [Exh. 4]

27.    Defendants advertised with those public web page solicitations the statement that their offered Service Agreement was available in all U.S. states. [*Id.*]

28.    Defendants posted on several of those web pages a solicitation video for what they called their "Shopify Automation Program." The program was described as paying to become a partner in a Shopify store created for the "investor" and run for the "investor." [Exh. 5]

29.    Defendants stated in that solicitation video the claim the store would be profitable within 90 to 120 days.

30.     Defendants stated in that solicitation video that "we have a track record of being able to set up these stores, scale them to $30,000 a month in net profit, in 6 to 9 months, and then putting it into a position to be sold for a 3x return on annual earnings."

31.     Defendants referred to Saddlebrook as running large brands on Shopify and having a credit limit in the "millions" that would be used to finance and build the investors' Shopify store.

32.     Defendants published in their video that Defendant Saddlebrook had an "[u]ncapped credit limit to scale ads" and they could keep spending on advertising to build the value of the store.

33.     Defendants in their solicitation video continually referenced this uncapped spending for advertising by Defendant Saddlebrook as the reason why they succeeded where most Shopify merchants failed.

34.     Defendants referred to these funds spent by Defendant Saddlebrook Investments as also eliminating any concern for the investor to come up with funds to pay for products to sell in the store.

35.     Defendants expressly referred to themselves as contributing the funds to grow the Shopify store and make it profitable and valued at least 3 times the $35,000 in investment in twelve months.

36.     Defendants referred to the investors and investments as passive. "You sit back and collect the checks." Defendants continually referred to their audience as "investors."

37.     Defendant Morgan states in that video the profit scale of $30,000 monthly to qualify for a sale at 3x the annual earnings, "based on the track record," is typically accomplished in a year. Defendants also state that a full return on investment is typically accomplished within eight to twelve months.

38.     Defendants stated in that video that the investment capital is used for Defendants to set up the store and select products, and Defendants handle everything else.

39.     Defendants' agent Mitchell stated in his posted Webinar video for this program they

7

have never had a Shopify store fail or Defendants gave up on.

40.    Defendant Morgan in the separate solicitation video attempts to calm skepticism with the viewer by stating "I've worked with twenty plus companies, 150 business buyers, $3.5 million in revenue."

41.    Defendants referred to creating a "Buyer Portal" software to allow each "investor" to have access to the other "investors" where they would deliver "transparent data to every single investor company and consultant on the platform." Defendants referred to that software as a means to protect "you and me from internet fraud."

42.    To add urgency and pressure to potential investors, Defendants claimed that the $35,000 program was only available to ten people, with the price to go up after that number of investors.

43.    Defendant Saddlebrook maintains a website at domain "saddlebrookinvestments.com." Defendants Saddlebrook and Simonsen published there the following claims about their values:

## Our values

### Transparency

At our organization, transparency is a core value that permeates all of our actions and decisions. We believe that open communication and honesty are fundamental to building trust with both our partners and colleagues. This commitment to transparency is at the heart of who we are and drives us to maintain the highest standards of integrity in all that we do.

### Integrity

We hold fast to the belief that ethical standards, honesty, and fairness are cornerstones of building trust and fostering meaningful connections. These principles are more than just ideals, they are the foundation upon which we conduct ourselves and interact with others. By embracing these values, we create a positive and respectful environment that inspires confidence, inspires trust and encourages collaboration. Through our unwavering commitment to ethical behavior, we strive to create long-lasting relationships built on integrity and mutual respect.

44.     Defendant Simonsen posts investment claims on many internet forums on a wide variety of topics such as self-storage and gold. On YouTube, he solicits investors for "Safe Secure High Return Real Estate Investing" and for minimum $100,000 investments in a "$100 million fund."

45.     Defendants Saddlebrook and Simonsen published the claim they possess "fintech expertise" and that Defendant Saddlebrook "is a collective of more than 60 individuals, each driven by a common purpose to create shared success. By aligning interests with those of its partners, Stuart Simonsen and Saddlebrook Investments embody the belief that company success is intrinsically linked to the success of the partners served."

46.     Defendant Saddlebrook claims of aligning its interests with "partners" tracked the language in the website solicitations for the Shopify Automation program, where Defendants referred to the investment as becoming a "partner" with them.

47.     Defendant Morgan published videos at domain address "alldoneconsulting.com/shopify/" soliciting these investments for what he called "Shopify Automation." He claimed therein the investor would see a "full return in about eight to twelve months." To solicit the investors, he states "we have access to millions in credit" to fund the site the investor would become a part owner of "and you get to sit back and collect the checks."

48.     The video background is of the 6815 E. Camelback Road building in that Defendants ADC and Morgan publicly list as the business address for Defendant ADC.

49.     On that same page advertising these investments, Defendants ADC and Morgan published "We have helped over 110 business partners start completely automated businesses in over 16 different opportunities & this is one of the best opportunities ever."

50.     On that same page, Defendants ADC and Morgan published that Shopify Automation works by having the website (Shopify store) loaded with products and a logo within "5-7 days", testing products with a modest budget within "7-14 days," and "[s]teady sales begin after 50-100 purchases which are done within the first 30-45 days as we begin to build data from

look-alike audiences and other metrics."

51.    Defendants ADC and Morgan published on that page videos of alleged sales reports for different Shopify stores run through their Shopify Automation program listing total sales of $2,094,570.64 in fourteen months, $6,772,162.11 in fourteen months, $36,849.51 in three months, $212,954.33 in six months, and $524,534.08 in fourteen months.

52.    As the final selling point to investors on that web page, labeled "More Security," Defendants ADC and Morgan referred to the investment as a "guarantee."

✔ **More Security**

Unlike many ecommerce automation models, a grand total of your dollars will be sent overseas to hire offshore workers. Instead with this deal you have two American companies/ CEO's signing off on your 18-month guarantee. We want you to be successful. Every client that wins brings us multiple streams of additional profit. That's why we stand by what we do.

53.    Plaintiffs and other investors had meetings over internet video platforms with Defendants to discuss and finalize the investments. Defendants Morgan and Simonsen have participated in those calls together.

54.    Those meetings over cable wires were conducted through interstate commerce.

55.    Defendants advertised the investments were available in every state.

56.    Defendants Saddlebrook and Simonsen published the claim they possess "fintech expertise" and Defendant Saddlebrook "is a collective of more than 60 individuals, each driven by a common purpose to create shared success. By aligning interests with those of its partners, Stuart Simonsen and Saddlebrook Investments embody the belief that company success is intrinsically linked to the success of the partners served."

57.    That tracked the language in the website solicitations for the Shopify Automation program, where Defendants referred to the investment as becoming a "partner" with them.

58.    Defendant ADC hosted on its website an additional solicitation video for the "Shopify Automation" program. Therein, Defendant Morgan referred to the program as "we offer to set you up with a completely done for you ecommerce store at a 45% profit margin." Defendant Morgan on behalf of the Defendants stated that the reason for the 45% split in profits was "our partner Stuart right, the owner of Saddlebrook Investments, he's going to be pumping tons of money into advertising to scale up the store and make it profitable." "Stuart, he's going to invest his money into marketing to get it profitable." Defendant Morgan referred to the arrangement as using the investors' money for initial costs that have a lower return than the marketing and advertising that Defendants performed and created greater returns. Defendant Saddlebrook's agent, Mitchell, solicited investors with the same promise. "We use our lines of credit to fund your store." "We're going to put about $60k into your store."

59.    Defendants in that ADC hosted video included the inducement that Defendant Simonsen "has access to very large lines of credit, and cash, and revenue from multiple stores that are able to fuel the profit of the store."

60.    In the solicitation video hosted on Defendant ADC's website, Defendant Morgan expressly stated that Defendants offered a buyback program in the first twelve months. Multiplied by the solicitation of at least ten $35,000 investors, Defendants were informing the investors they or Defendants ADC and Morgan had the financial ability to pay back at least $350,000 over the next twelve months.

61.    In the solicitation video hosted on Defendant ADC's website, Defendant Morgan confirmed again the investors did nothing with the running of the Shopify store, and the running of the store would be performed by Defendants' team.

62.    On Defendant ADC's website soliciting these investments, Defendants ADC and Morgan referred to the program as:

11

1        a.     A guarantee.

2        b.     Being involved with Defendants ADC and Saddlebrook Investments, which

3  allegedly both had "a proven multiple 6-figure track record."

4        c.     "Our program is designed to make sure that our clients get at least half of

5  their money back by month 6 with a full return by month 10."

6        d.     "Within a week your site will be up with your first customers buying from

7  your store in the next 2-3 weeks."

8      63.     On one of the Webinar videos hosted by Defendant Mitchell, he stated about

9  Defendant Saddlebrook that "we put our money into it, we put in more than you put up front."

10      64.     Defendants' agent Mitchell in September 2022 posted a video advertising the

11  Shopify Automation program as a "passive" investment. "Effectively put your money to work

12  with the experts in Ecommerce to bring you a passive stream of income with risk lower than other

13  opportunity out there." "WE DO ALL OF THE WORK FOR YOU! For a split profit share."

14      65.     Defendants' agent Mitchell in September 2022 published the materially false

15  statement "Our Shopify stores have a proven process and have never lost money."

16      66.     Defendants' agent Mitchell in that September 2022 "Webinar" published the

17  materially false statement "Your Shopify store becomes a valuable asset! It is digital real estate

18  and has a going market value of 4-6x its annual income."

19      67.     Defendants' agent Mitchell in that September 2022 "Webinar" published the

20  materially false statement "The fact that we fund the marketing with peak adspend dollars, the

21  sale of the store can be a 7-figure sale in 12-18 months, with you pocketing 45%."

22      68.     Defendants' agent Mitchell in that September 2022 "Webinar" published the

23  materially false statement that every store Defendants ever sold, "sold for more than a million

24  dollars."

25      69.     Defendants' agent Mitchell referred to Defendant Simonsen as his "partner," as by

26  that time Defendant Mitchell had gone to work directly for Defendants Saddlebrook and

Simonsen.

70.    As the owner and CEO of Defendant Saddlebrook, Defendant Simonsen was a controlling person of his sales agents including Defendant Mitchell and Defendants ADC and Morgan.

71.    Defendants both in their solicitation videos and Service Agreement contracts informed the investors they would own the Shopify store.

72.    The various solicitations, videos, and documents refer to the solicited business as a "joint venture," "partner", and "investment."

73.    Defendants participated in and posted a video in June 2022 stating they already sold two hundred stores.

74.    In April 2023, Defendant Morgan stated publicly that his relationship with Defendants Simonsen and Saddlebrook had soured, that the investors were not getting Shopify stores that worked as promised and were not receiving their guaranteed refunds.

75.    In that April 2023 video, Defendant Morgan acknowledged that these automation programs, which necessarily included Defendants' Shopify Automation program, "they don't work." Regarding the companies and people claiming to operate those programs, Defendant Morgan acknowledged "they're all full of it." That was a confession and admission that Defendants Saddlebrook and Simonsen could not deliver the Shopify stores as promised.

76.    Defendants Morgan and Simonsen informed Investor #2 that Defendants sell "high end products" on the Shopify stores they create for the investors. Defendant Simonsen told the investor he himself does this with Shopify. Defendant Simonsen referred to himself as the owner of Saddlebrook and told the investor Saddlebrook is worth "millions."

77.    Defendants told Investor #2 they "guaranteed" sales through the Shopify store they would create for him within thirty days, a full return on investment within nine months, and Defendant Saddlebrook would take 45% of the profits and Defendant ADC would take 10%.

78.    Plaintiffs and other investors demanded from Defendants the login information for

the alleged Shopify stores that were created for them as part of the contract/investment. Defendants refused. Defendant Saddlebrook and Simonsen would instead only send screen captures of what they alleged were Shopify stores created for Plaintiffs and the other investors. That effectively prevented Plaintiffs and the investors from being able to confirm or debunk the entire basis for the contract/investment or the continuing stories made by Defendants for why they were not fulfilling the terms of the contract/investment or anything approaching their claims in the solicitations of the investments.

79.     Investors have demanded the refund of their money. Defendants refuse for a variety of reasons that continue to change. Defendant Simonsen has tried to change the subject to other alleged investment opportunities. Defendant Morgan has done the same. Defendants Saddlebrook and Simonsen claim that the contract leaves the investors with only the right to demand a refund from Defendants Morgan and ADC.

80.     Plaintiff Threadgill demanded the refund of his investment several times.

81.     Defendant Saddlebrook through its agents claimed part of the delay in opening or operating a Shopify store as promised was due to failures by Defendants ADC and Morgan. Those agents informed Plaintiff Threadgill Defendant Saddlebrook had terminated the relationship with Defendants ADC and Morgan.

82.     Defendant Morgan published in that April 2023 video the acknowledgment the investors were not being paid back as promised, and Defendant ADC and its agents sent $440,000 in investor money to Defendant Saddlebrook for thirteen investors of the Shopify Automation program.

83.     Defendant Saddlebrook's alleged COO, Casey Cain, has claimed that Defendant Saddlebrook operates at least thirty more Shopify stores for clients beyond those started through the Service Agreement that included Defendant ADC.

THE SPECIFIC SOLICITATIONS

84.     Defendants authorized and used agent Travis Kohner to contact potential investors.

14

Kohner contacted Plaintiff Threadgill via the instant messenger function of Instagram through the guise of asking Plaintiff Threadgill investment advice.

85.    When Plaintiff Threadgill asked Kohner what Kohner was working on, Kohner pitched to Plaintiff Threadgill online business automation as an "investment." Kohner emailed Plaintiff Threadgill solicitation marketing for Defendants' Service Agreements.

86.    On Defendants' behalf, Kohner told Plaintiff Threadgill that the Shopify stores would sell for more than $1 million within one year of the investment. On Defendants' behalf, Kohner told Plaintiff Threadgill that Defendants had a seven-figure line of credit for funding the advertising of the store to build its profits and value.

87.    Plaintiff Threadgill spoke with Defendant Simonsen, Defendant Mitchell, and Kohner via the Zoom video platform.

88.    Defendants Simonsen and Mitchell informed Plaintiff Threadgill they were successfully operating many Shopify stores.

89.    To put pressure on Plaintiff Threadgill to invest, Defendants Simonsen and Mitchell claimed an investor wanted to purchase twenty stores with them and the investment might go away or become more expensive.

90.    Defendants Simonsen and Mitchell informed Plaintiff Threadgill the Shopify stores they create and run sell for more than $1 million.

91.    Defendants Simonsen and Mitchell informed Plaintiff Threadgill the stores typically make ten to thirty thousand dollars in profits after about three to four months.

92.    Defendants Simonsen and Mitchell informed Plaintiff Threadgill they successfully achieve these results because they locate and sell through these stores "high-quality goods" through "high-quality suppliers."

93.    To obtain Plaintiff Threadgill's investment, Defendants Simonsen and Mitchell informed Plaintiff Threadgill he was protected by a Buy Back provision in the first year of the investment.

94.    Another investor, Investor #2, was contacted by an agent for Defendant ADC when he sought opportunities on websites hosting franchise opportunities.

95.    That investor spoke with Defendants Simonsen and Morgan via video prior to making his $40,000 investment.

96.    Defendants Simonsen and Morgan attempted to allay his concerns with the investment by referring him to the "buy back" provision in the first twelve months. Upon information and belief, Defendants knew their reference to a buyback provision was false and omitted material information to make it misleading:

a.    Defendants were soliciting more than ten investors, which would require a minimum of $350,000 under the Buy Back provision. Defendants ADC and Morgan within months of soliciting these investments, claimed to have no money, demonstrating the possibility of fulfilling the Buy Back provision was from inception a known impossibility.

97.    Defendants Simonsen and Morgan informed that investor they sell "high-end products" in the Shopify stores they create and run for the investors. That statement was materially false as it was intended to induce the investment. Defendants could never produce for an investor any store generating more than nominal sales or any quality merchandise.

98.    Defendant Simonsen stated he owns and runs multiple Shopify stores.

99.    Defendant Simonsen referred to himself as the owner of Defendant Saddlebrook and stated it was worth "millions."

100.    Defendants told Investor #2 there were guaranteed sales in the Shopify store within thirty days and guaranteed return on investment within nine months. That statement was materially false and designed to induce the investment. Defendants could never produce for an investor any store generating more than nominal sales or any quality merchandise.

101.    Relying on those statements and the statements in Defendants' published solicitation materials recited above, Investor #2 sent Defendants the $40,000 to enter the Service Agreement.

16

102.    Plaintiff Jake Orzalli entered a service agreement with Defendants in July 2022.

103.    Defendant Mitchell initially contacted Plaintiff Orzalli and referred to these Service Agreements as an "automation" program.

104.    Prior to investing, Plaintiff Orzalli participated in an online video meeting with Defendants Simonsen and Mitchell. Other potential investors were also part of the meeting.

105.    Defendant Simonsen stated he was operating Shopify stores and found a "pretty-good way to be profitable" "and also found out that they were very easy to sell."

106.    Defendant Mitchell advocated Defendants' Service Agreements as a "game changer" because Defendant Simonsen uses all of his money for the products and for the marketing. Defendant Mitchell referred to that as "thousands and thousands a month." Defendant Simonsen stated the only way to scale the stores is with infusion of his cash, referring again to how Defendants uniquely could make these work.

107.    Defendant Simonsen referred to this as "passive stores."

108.    Defendant Simonsen stated they use an "app" that provides full transparency to the client, including the amounts for sales, "adspend," and profits. Defendant Simonsen told the investor he would have full access to that app to track these items.

109.    Defendant Simonsen told Plaintiff Orzalli to expect, based on Defendants' experience:

a.    $5,000-$6,000 in profits monthly around six months;

b.    $10,000-$15,000 in profits monthly around nine months; and

c.    $25,000-$30,000 in profits monthly around twelve months.

110.    Defendant Simonsen stated that would turn the client's store into a $1 million valued store for a third-party sale. Defendant Simonsen referred to selling multiple stores for people, typically at a 4 to 6 times multiplier from the annual profits generated according to the numbers he claimed to generate. Defendant Simonsen referred to that as a good system because they turned around and started more stores.

17

111.    Defendant Mitchell stated Defendant Simonsen is putting "way more" than $35,000 into each store. Defendant Simonsen agreed and stated the money out of pocket after the initial investment "is all mine."

112.    Defendant Mitchell referred Plaintiff Orzalli to the safety of a "Buy Back" provision in the first twelve months paid for by Defendant ADC, but boldly stated the investors would never want to exercise it.

113.    Defendants Simonsen and Mitchell showed Plaintiff Orzalli an alleged "escrow invoice" for the sale of a store for more than $1 million.

114.    Defendant Mitchell put pressure on Plaintiff Orzalli with the statement that they were allowing these investments at $35,000 for only about five to six more people, then the price would go up to $50,000. Defendant Mitchell stated he had a "client" seeking to purchase two hundred stores.

115.    Defendants Simonsen and Mitchell told Plaintiff Orzalli he would be part of transparent network of clients that could communicate and share information. Defendants Simonsen and Mitchell pitched that network as the alternative to trying to reach out to some support person who would disappear.

116.    Plaintiff Oliver Christy was first contacted by an alleged Defendant ADC agent named Brett Mavrich. Mr. Mavrich reached out to Plaintiff Christy after Plaintiff Christy filled out a request for information on franchisegater.com.

117.    Mr. Mavrich sent a link to Plaintiff Christy to the solicitation videos posted on the Defendant ADC website and the Defendant ADC website listing alleged reports for stores making in excess of $6 million in sales annually.

118.    On the direct video links sent to Plaintiff Christy, Defendants ADC and Morgan pitched these service agreements as:

a.    The only opportunity for Shopify automation where the investor was not responsible for the adspend;

18

b.  Defendants had "millions" available to fund the advertising for the store;

c.  Defendants had an operating program that would provide full return on investment within one year;

d.  Defendants had an operating program that built Shopify stores to monthly profits of $30,000; and

e.  Defendants had an operating system that would allow the investor to sell that store for around $900,000 around the year mark.

119.  Plaintiff Christy later spoke directly with Mr. Mavrich and Defendant Simonsen. To put pressure on Plaintiff Christy, Mr. Mavrich repeated the same claim made to other investors that a "hedge fund" owner wanted to purchase two hundred of these automated Shopify stores through Defendants ADC and Saddlebrook, which would make the opportunity for Plaintiff Christy disappear.

120.  Mr. Mavrich and Defendant Simonsen led Plaintiff Christy to believe they were currently operating several Shopify stores making profits consistent with the projections they sent to him.

121.  Mr. Mavrich and Defendant Simonsen informed Plaintiff Christy within a few months his store should be generating $5,000 in monthly profits and $20,000 to $30,000 in monthly profits around twelve months.

122.  Mr. Mavrich and Defendant Simonsen informed Plaintiff Christy these profits were possible because Defendant Simonsen would be spending significant money to advertise the store, which was necessary for an online Shopify store to grow and generate large profits.

123.  Mr. Mavrich on behalf of Defendants sent Plaintiff Christy an alleged escrow invoice for the alleged sale of a Shopify store run by Defendants with a listed sale price greater than $1 million.

124.  Mr. Mavrich and Defendant Simonsen led Plaintiff Christy to believe they were identifying unique, high-quality goods to compete with sites such as Amazon. They claimed they

performed that function in contrast to other sites that just post junky products for sale.

### THE ACTUAL "RESULTS"

125.    Plaintiff Threadgill never received a Shopify store that was allegedly his property or that operated anything close to what he was informed as to sales or profits. Plaintiff Threadgill does not even know whether his alleged Shopify store makes any current sales or profits.

126.    On information and belief, based upon messages exchanged with Plaintiff Threadgill from the other investors, no investor has received a Shopify store that was allegedly their property or that operated anything close to what Defendants claims as to sales, marketing, or profits.

127.    Concerned whether Defendants' claims of building and running for him a store were true, Plaintiff Threadgill demanded the login information for the Shopify store. Defendants continued to make excuses to prevent Plaintiff Threadgill from logging in to the store, such as suggesting Shopify rules or policies prevented them from creating login credentials.

128.    When Plaintiff Threadgill demanded this access, Defendants instead sent screen captures for an alleged store, which necessarily prevented Plaintiff Threadgill from logging in to verify or debunk Defendants' claims.

129.    In contrast to their claims of successfully running and selling many Shopify stores, Defendants blamed the delay in launching or running a successful Store on the Shopify website and software.

130.    Plaintiff Threadgill spoke directly with Sadlebrook officer Casey Cain about the problems. Mr. Cain blamed Defendants ADC and Morgan for the problems even though Defendants ADC and Morgan had no role in creating the store, obtaining products, or advertising.

131.    Plaintiff Threadgill is part of a text message exchange with several other investors. Each confirmed they have not received the sales or profits promised, or received a refund as demanded and promised in the original solicitations and written contract.

132.    Plaintiff Threadgill investigated the alleged products for sale on his alleged website

and discovered all or most are cheap goods sold through drop shipping sites from Asian markets. In short, the website is a drop shipping site that is easy to construct and designed to sell cheap goods through third parties.

133.    Plaintiff Orzalli had several conversations with Defendants' agents as the store allegedly created for him did not perform or appear anything other than basic and junky.

134.    Plaintiff Orzalli could only ever find an alleged $400 over several months spent on advertising for his alleged store. Plaintiff Orzalli otherwise did not receive reports as promised for his alleged store or the access to an app to provide the transparency he was promised.

135.    In contrast to the promised transparency and portal for all clients to communicate with each other, Defendants became concerned that Plaintiff Orzalli was communicating with other investors and requested he not communicate with the other investors unless it was to say something positive about the program.

136.    In a January 2023 video meeting, Defendant Saddlebrook's officer Casey Cain spoke with Plaintiff Orzalli and others. Cain blamed the delay and underwhelming results on Defendants ADC and Morgan. Defendants through Cain claimed that Plaintiff Orzalli and other investors should be seeing profits already. That was materially false as Defendant Saddlebrook took on the obligations to build, fund, and fund the advertising for these stores with the alleged track record of success, profits in months, full return on investment in a year, and million-dollar sale value based on previous sales.

137.    In that video meeting, Cain denied previously working for Defendant ADC, and stated he previously knew Defendant Morgan did not know what he was doing.

138.    The very next month, Defendants Saddlebrook and Simonsen contradicted that excuse for nonperformance. In a February 2023 video meeting, Defendant Simonsen continued to pitch the program and suggested when Plaintiff Orzalli and other investors started receiving these large profits, they should buy more Shopify stores through them. Defendant Simonsen

referred to Defendant ADC as "clean" and stated the new stores would still be purchased through Defendants Saddlebrook and ADC, as they are married for future deals.

139.    Since that video meeting, Plaintiff Orzalli has bounced between various points of contact who have quickly disappeared.

140.    Most recently, Defendants Simonsen and Mitchell have blamed the lack of transparency and communication on Defendant Saddlebrook's own alleged COO, Casey Cain. Defendants Simonsen and Mitchell have also claimed delay based on the alleged contract with ADC giving Defendant ADC ten percent of the store profits.

141.    That excuse for delay was false as the Service Agreement grants only Defendant Saddlebrook a percentage of the store profits. That excuse for delay was false for the additional reason that by Defendants' own solicitations, the store profits, based on a proven track record, resulted from product selection and marketing. That was all to be performed by Defendant Saddlebrook independent of Defendants ADC and Morgan.

142.    Investor #2 also requested login access to their alleged Shopify store. Defendants again refused that request.

143.    Defendants created for Investor #2 an alleged Shopify store for Christmas items.

144.    Like the other investors, Investor #2 did not receive the sales or profits claimed and requested a refund pursuant to the Buy Back provision in the contract.

145.    Plaintiff Christy never received a dollar of alleged profit for the website store created for him.

146.    Plaintiff Christy had to repeatedly demand accounting for the alleged store. That came after weeks of delay which Defendants blamed on the Shopify software. That contradicted Defendants' claims of a track record of building and running many Shopify stores that made hundreds of thousands of dollars in annual profits.

147.   When Defendants finally posted an alleged operating Shopify store for Plaintiff Christy, he noticed Defendants used Shopify software and did not even complete filling out the generic instructions from Shopify for the store.

148.   When Plaintiff Christy finally received reports, he discovered Defendants were spending around $300 monthly on ads for his store. The store had an alleged total of $1600 in sales.

149.   Plaintiff Christy researched the smartwatch allegedly for sale on his website. It is a cheap product available from drop shipping sites direct from Asian markets that sell cheap goods in bulk.

150.   Plaintiff Christy knows how simple it is to build a drop shipping Shopify store. He has separately built one that began successfully selling goods. That cost $400 and took five days' time.

### THE FALSE AND MISLEADING STATEMENTS AS PART OF THE SCHEME

151.   Defendants published and made a litany of false and misleading statements designed to induce the clients to enter these contracts. Upon information and belief, recited below, Defendants did so intending and knowing these statements were false and misleading to induce these investments.

152.   To simultaneously create pressure and comfort to induce these investments, Defendants intentionally made the false statements about the operations, profitability, track record, and value of these Shopify stores were a "guarantee." Upon information and belief, Defendants made the intentionally false statement an investor was going to purchase two-hundred stores and take away this opportunity. That information and belief is based upon Defendants instead continuation of these solicitations and investments up through early this year.

153.   Defendants intentionally made the false and misleading statement they stock these Shopify stores with high-quality goods.

154.   On information and belief, contrary to the promise made to these potential investors

23

to stock the stores with high-quality goods, Defendants have instead run the stores as drop shipping stores. A review of the products allegedly for sale on the websites allegedly created by Defendants demonstrates products for sale on foreign commerce websites with volumes of cheap goods such as AliExpress. That is not a calculated system of high-quality goods. It is part of a standard online scheme pitched for people to create nearly do-nothing Shopify stores that sell cheap goods supplied and shipped by third parties.

155.   Upon information and belief, Defendants intended and knew they were making false and misleading statements the investors would own the store created for them. Rather, Plaintiffs and other investors demanded login access to the Shopify stores allegedly being created for them. Defendants refused to do so and continued to stonewall and change stories for why they could not do so.

156.   Defendants would instead send pictures of the stores to claim the existence of the stores. That prevented Plaintiffs and the investors any ability to login or corroborate or debunk Defendants' statements.

157.   Defendants later told Plaintiffs and other investors a Shopify rule or policy prevented Defendants from creating the stores in the name of the investor. That directly contradicted Defendants' claim they were creating an ecommerce store to be owned by the investor, and:

        a.   They had allegedly been running this program since 2021;

        b.   They had allegedly been successfully running this program since 2021;

        c.   They had allegedly been running some sixty Shopify stores for investors; and

        d.   They had fintech and ecommerce expertise as claimed when they did not understand Shopify rules or policies by their own stories.

158.   Upon information and belief, Defendants intentionally and knowingly made the following false and misleading claims about the timing of the expected sales and profits and Defendants' alleged track record for expected sales and profits:

a.      They guaranteed sales through the store within thirty days;

b.      They had a track record with stores up and loaded with products within one week, testing products for sale within two weeks, and steady sales after 50 to 100 purchases within the first 30 to 45 days;

c.      The store would be profitable within 90 to 120 days;

d.      The stores typically reached $5,000-$6,000 in profits monthly around six months;

e.      The stores typically reached $10,000-$15,000 in profits monthly around nine months;

f.      The stores typically reached $25,000-$30,000 in profits monthly around twelve months;

g.      Defendants had a track record of building the stores to $30,000 in monthly profit in 6 to 9 months;

h.      Defendants had a track record of building the stores to $30,000 in monthly profits in 12 to 18 months;

i.      Defendants, based on a track record, expected for the investor to see a full return on investment in less than one year;

j.      Defendants, based on a track record, were flipping/selling stores based on a multiplier of building these stores to $30,000 in monthly profits;

k.      Defendants have never had a Shopify store fail or that Defendants gave up on;

l.      Defendants ADC and Saddlebrook both had "a proven multiple 6-figure track record;"

m.      Defendants had alleged sales reports for Shopify stores run through their Shopify Automation program listing total sales of $2,094,570.64 in fourteen months,

25

$6,772,162.11 in fourteen months, $36,849.51 in three months, $212,954.33 in six months, and $524,534.08 in fourteen months; and

       n.   "Our Shopify stores have a proven process and have never lost money."

159.   Upon information and belief, Defendants intentionally and knowingly made the false and misleading statements about the necessary marketing plan and funding necessary and available for the promised Store to succeed:

       a.   "Service Provider shall create and execute on behalf of the Business a continuous social media advertising campaign;"

       b.   Defendants had an "uncapped" budget of "millions" for the necessary advertising and that would be used for that necessary advertising;

       c.   Defendants would be "pumping tons of money into advertising to scale up the store and make it profitable;"

       d.   "[O]ur partner Stuart right, the owner of Saddlebrook Investments, he's going to be pumping tons of money into advertising to scale up the store and make it profitable." "Stuart, he's going to invest his money into marketing to get it profitable;"

       e.   "We're going to put about $60,000 into your store;"

       f.   Defendants have access to revenue from other profitable stores to fuel the profit of the new stores;

       g.   Defendants put more money into the store than the investor;

       h.   Defendants would spend "thousands and thousands a month" on advertising for the store to reach the profitability numbers; and

       i.   Defendant Simonsen would be spending "way more" than $35,000 into each store.

160.   Upon information and belief, Defendants intentionally and knowingly made the false and misleading statements about the existence of, and alleged track record for creating Shopify stores of a multiple value, and selling Shopify stores created for investors:

a.      "we have a track record of being able to set up these stores, scale them to $30,000 a month in net profit, in 6 to 9 months, and then putting it into a position to be sold for a 3x return on annual earnings."

b.      Defendants had never had a store fail or that they gave up on;

c.      Defendants only sold stores (plural) for more than $1 million;

d.      That based on their track records, Defendants expected the stores around one year to be worth more than 3x the initial investment, around $1 million;

e.      "Your Shopify store becomes a valuable asset! It is digital real estate and has a going market value of 4-6x its annual income."

f.      Defendants had already sold multiple stores for prior investors, typically at a multiple of four to six times the annual profits, which were the profits claimed as their track record;

g.      Defendants had already sold two hundred stores;

h.      Defendants ADC and Saddlebrook both had "a proven multiple 6-figure track record;"

i.      Defendants had alleged sales reports for Shopify stores run through their Shopify Automation program listing total sales of $2,094,570.64 in fourteen months, $6,772,162.11 in fourteen months, $36,849.51 in three months, $212,954.33 in six months, and $524,534.08 in fourteen months; and

j.      "Our Shopify stores have a proven process and have never lost money."

161.    That information and belief is shown and supported by the following information:

a.      In contrast to their claimed track record and expertise, Defendants do not seem able to create a profitable store for any investor as experienced and communicated by the investors with each other;

b.      In contrast to their claimed track record and expertise, Defendants have continually blamed Shopify for an alleged inability to allow the investor ownership of the store

27

1  or login access to the store;

2          c.      Defendants have sent screen captures of alleged data to investors that cannot

3  be examined for accuracy or determination whether it applies to their store;

4          d.      Defendants have not shared a working application that allows the investors

5  access to the data for their alleged stores, such as marketing spent, sales, or profits;

6          e.      Defendants have asked investors to not share their experiences and

7  information with each other;

8          f.      The only information available to investors has shown a few hundred dollars

9  spent on marketing against Defendants' promises to spend thousands each month on each store,

10  from an uncapped marketing budget of "millions;"

11          g.      This negligible marketing budget directly contradicts Defendants' claim of

12  cash flow from continually growing stores funding the marketing budget and Defendants' claim

13  of a proven track record, sales of 200 stores, and sales of stores for only in excess of $1 million;

14          h.      Products listed for sale on the alleged Shopify stores created for investors

15  appear to be cheap goods from foreign sellers commonly sought out for drop shipping sites that

16  can be created in days for a few hundred dollars;

17          i.      Defendants have made illogical excuses for the delay and failures and

18  pointed fingers at each other, and their own agents such as blaming the broker for store failures

19  and claiming store failures because of an alleged 10% draw on store profits;

20          j.      These delays and failures come against Defendants' claims that starting these

21  stores is easy, can be done in less than two weeks, all on a proven track record; and

22          k.      Defendant Morgan recently confessed that these automation programs do not

23  work and he has sold businesses that do not even exist.

24          162.    Plaintiffs, and other investors, have relied and reasonably relied upon these

25  statements by Defendants made to induce their investments.

26

**N**O **O**NE **C**AN **G**ET **T**HEIR **M**ONEY **B**ACK OR A **S**TRAIGHT **S**TORY

163.    Investors, including Plaintiffs and Investor #2 were part of a phone messenger thread with other investors. Every investor reported they did not receive either an operating store or a store operating at anything close to what was advertised. Each confirmed they had not received their money back.

164.    Plaintiff Threadgill has demanded his refund several times. Plaintiff Christy demanded his refund.

165.    Defendant Simonsen in December 2022 falsely claimed to Plaintiff Threadgill "You [sic] contract guarantee is with ADC and not Saddlebrook." The copy of that contract attached at Exhibit 1 states: "The Broker and/or Service Provider shall provide to Client [] a refund." Defendant Saddlebrook Investments is the "Service Provider" contracted to fulfill that Buy Back provision.

166.    On April 19, 2023, Plaintiff Threadgill sent a text message to Defendant Simonsen demanding his refund. Plaintiff Threadgill sent Defendant Morgan demands for a refund on March 28, 2023, and April 19, 2023. Plaintiff Threadgill's most recent certified letters terminating the agreement and demanding a refund were returned to sender.

167.    Investor #2 repeatedly requested a refund of their money.

168.    Investor #2 sent Defendants wire information for a refund. Defendants claimed they could not send money to that specific financial institution.

169.    Investor #2 then sent wire information for a different financial institution. Defendants then claimed they needed the investor's ACH information. The investor sent Defendants ACH information. Defendants did not refund the money or respond.

170.    Defendant Simonsen claimed to Plaintiff Orzalli, Plaintiff Christy, and Investor #2 that Defendant Morgan is responsible for the refund. In direct contrast to his statements in February 2023, Defendant Simonsen claimed he cancelled the contract with Defendants ADC and Morgan because they were unreliable.

171.    Defendant Morgan denied owing investors a refund and instead told the investors that the investors are going to become part owner in an app that Defendant is launching.

172.    Defendant Morgan claimed to the investors that he does not have any money to refund their investors. No Plaintiff or investor would have invested had they known Defendants Morgan and ADC were not funded to cover the Buy Back they relied on and were told by all of the Defendants to rely upon.

## COUNT ONE
### (Breach of Contract)

173.    Plaintiffs incorporate the foregoing allegations as though fully set forth herein.

174.    Plaintiffs were induced to enter into a Service Agreement with Defendants (the "Contract"). A true and correct copy of the Contracts are attached as Exhibits 1, 2, and 3.

175.    Defendant Morgan entered into the Contract under the name of ADC, a fictitious entity, as an alter ego and, therefore, was a direct party to the Contract.

176.    Under the terms of the Contract, Plaintiffs paid $35,000 to Defendants in exchange for Defendants' "start-up and operation of an online business on the Shopify website" (the "Store").

177.    The purpose of the Store, according to the Contract, was to sell unspecified "goods and/or services online to customers." Under the terms of the Contract, Plaintiffs had no obligations beyond the initial $35,000 payment and, in fact, were prohibited from controlling any aspects of the Store.

178.    Under the terms of the Contract, Defendant Saddlebrook took on the following express terms and duties:

a.  Client shall have accounting access at all times during the course of this Agreement to the Shopify Account.

b.  Service Provider shall create and execute on behalf of the Business a continuous social media advertising campaign.

    c. Service Provider shall ensure the Client's access to the Shopify Account and shall provide monthly comprehensive reports, on a timely basis, regarding all aspects of the Business including, but not limited to, advertising, operations, and finances.

179. The Contract included the following term:

If within the first twelve (12) months following the execution of this Agreement, the Client is dissatisfied with the performance of the Store developed by the Service Provider or the quality of the service provided by the Service Provider or Broker, the Client shall be entitled to terminate this Agreement upon ten (10) days' prior written notice and the Broker and/or Service Provider shall within thirty (30) days of the date of the notice, provide to Client a refund of the initial Thirty-Five Thousand Dollar ($35,000.00) payment pursuant to Section 9 <u>Buy Back Agreement</u>, in this Agreement

180. The Buy Back Agreement alternatively reads as either an obligation of both Defendants Saddlebrook and ADC, or alternatively as an obligation of Defendant ADC.

181. Defendants drafted the Contracts.

182. Plaintiffs and the other investors were thoroughly dissatisfied with the Store's performance. The Stores did not perform at all.

183. Defendants have not provided Plaintiffs the Contract's terms for accounting, account access, or a marketing campaign. Defendants are in breach of those terms. Due to the lack of promised account access, Plaintiffs are still uncertain whether Defendants actually constructed a Shopify store that each owns, or exclusively owns as set out in the Contract.

184. Defendants have not created the continuous advertising campaign, and certainly not the promised continuous advertising campaign of thousands each month. Defendants are in breach of that term.

185. Plaintiff Threadgill initially gave written notice to Defendants on December 1, 2022, that he was terminating the Contract and exercising his rights under the Buy Back agreement. Threadgill subsequently, and on multiple occasions, recommunicated to Defendants he had terminated the Contract.

186. Plaintiffs and other investors gave written notices to Defendants terminating the Contracts and exercising their Buy Back rights.

31

187.    Defendants each had an independent obligation to refund Threadgill his initial $35,000.00 payment "within thirty (30) days of the date of the notice" and refund the initial investments to all clients with the contract language "Broker and/or Service Provider" shall provide the refund. Under the alternative language, Defendant ADC had an independent obligation to refund to the other Plaintiffs and investors their initial investment "within thirty (30) days of the date of the notice."

188.    Defendants breached the Contract by failing to pay Threadgill or the other Plaintiffs and investors $35,000.

189.    Plaintiffs are entitled to their $35,000, plus consequential and incidental damages including lost opportunities.

190.    The action arises out of contract and Threadgill is entitled to an award of costs, attorneys' fees, and prejudgment interest pursuant to the Contract as well as A.R.S. §§ 12-341, 12-341.01, Tex. Civ. Prac. & Code Ann. § 38.001, Tex. Fin. Code Ann. § 304.102. Plaintiffs and other investors are entitled to an award of costs, attorneys, fees, and prejudgment interest pursuant to the Contract as well as A.R.S. §§ 12-341 and 12-341.01.

191.    As discussed below, Defendants perpetrated a fraud upon Plaintiffs and the other investors in a manner that requires the court to pierce the corporate veil and hold them personally liable for breach of contract.

## COUNT TWO
### (Breach of the Covenant of Good Faith and Fair Dealings)

192.    Plaintiffs reincorporate all previous allegations as if fully stated herein.

193.    Implied in every contract in Arizona is an implied covenant of good faith and fair dealing whereby each party to a contract promised to act in such a way so as to not deprive any other party from the benefit of their bargain.

194.    The parties entered into the Agreement, as outlined herein.

195.    Plaintiffs preformed all of their obligations under the Agreement, or was excused from doing so.

196.    Defendants failed to perform their obligations under the Agreement, and breached the covenant of good faith and fair dealing as outlined herein. Specifically, but not exclusively, Defendants stalled Plaintiffs and the other investors from pursuing their Buy Back provisions and legal remedies, and denied Plaintiffs and the other investors the basic information promised for Plaintiffs and the investors to determine whether Defendants ever performed the services they promised.

197.    On information and belief, Defendants' breach of the duty of good faith and fair dealing was done to coverup and stall discovery of Defendants' breach of contract and the fraud perpetrated on Plaintiffs and the other investors.

198.    As a direct and proximate result of Defendants' breach, Plaintiffs have been damaged in an amount to be proven at trial, but not less than $50,000.

199.    This matter arises out of contract and Plaintiffs are therefore entitled to an award of costs, attorneys' fees, and prejudgment interest pursuant to the Contract as well as A.R.S. §§ 12-341, 12-341.01, Tex. Civ. Prac. & Code Ann. § 38.001, Tex. Fin. Code Ann. § 304.102.

**COUNT THREE**
**(Fraud)**

200.    Plaintiffs incorporate the foregoing allegations as though fully set forth herein.

201.    To simultaneously create pressure and comfort to induce these investments, Defendants intentionally made the false statements about the operations, profitability, track record, and value of these Shopify stores were a "guarantee."

202.    Upon information and belief, Defendants made the intentionally false statement an investor was going to purchase two-hundred stores and take away this opportunity. That information and belief is based upon Defendants instead continuation of these solicitations and investments up through early this year.

33

203.    Defendants intentionally made the false and misleading statement they stock these Shopify stores with high-quality goods.

204.    On information and belief, contrary to the promise made to these potential investors to stock the stores with high-quality goods, Defendants have instead run the stores as drop shipping stores. A review of the products allegedly for sale on the websites allegedly created by Defendants demonstrates products for sale on foreign commerce websites with volumes of cheap goods such as AliExpress. [Exhs. 6, 7, 8] That is not a calculated system of high-quality goods. It is part of a standard online scheme pitched for people to create nearly do-nothing Shopify stores that sell cheap goods supplied and shipped by third parties.

205.    Upon information and belief, Defendants intended and knew they were making false and misleading statements the investors would own the store created for them. Rather, Plaintiffs and other investors demanded login access to the Shopify stores allegedly being created for them. Defendants refused to do so and continued to stonewall and change stories for why they could not do so.

206.    Defendants would instead send pictures of the stores to claim the existence of the stores. That prevented Plaintiffs and the investors any ability to login or corroborate or debunk Defendants' statements.

207.    Defendants later told Plaintiff and other investors a Shopify rule or policy prevented Defendants from creating the stores in the name of the investor. That directly contradicted Defendants' claim they were creating an ecommerce store to be owned by the investor, and:

a.    They had allegedly been running this program since 2021;

b.    They had allegedly been successfully running this program since 2021;

c.    They had allegedly been running some sixty Shopify stores for investors; and

d.    They had fintech and ecommerce expertise as claimed when they did not understand Shopify rules or policies by their own stories.

34

208.    Upon information and belief, Defendants intentionally and knowingly made the following false and misleading claims about the timing of the expected sales and profits and Defendants' alleged track record for expected sales and profits:

      a.     They guaranteed sales through the store within thirty days;

      b.     They had a track record with stores up and loaded with products within one week, testing products for sale within two weeks, and steady sales after 50 to 100 purchases within the first 30 to 45 days;

      c.     The store would be profitable within 90 to 120 days;

      d.     The stores typically reached $5,000-$6,000 in profits monthly around six months;

      e.     The stores typically reached $10,000-$15,000 in profits monthly around nine months;

      f.     The stores typically reached $25,000-$30,000 in profits monthly around twelve months;

      g.     Defendants had a track record of building the stores to $30,000 in monthly profit in 6 to 9 months;

      h.     Defendants had a track record of building the stores to $30,000 in monthly profits in 12 to 18 months;

      i.     Defendants, based on a track record, expected for the investor to see a full return on investment in less than one year;

      j.     Defendants, based on a track record, were flipping/selling stores based on a multiplier of building these stores to $30,000 in monthly profits;

      k.     Defendants have never had a Shopify store fail or that Defendants gave up on;

      l.     Defendants ADC and Saddlebrook Investments both had "a proven multiple 6-figure track record;"

m.    Defendants had alleged sales reports for Shopify stores run through their Shopify Automation program listing total sales of $2,094,570.64 in fourteen months, $6,772,162.11 in fourteen months, $36,849.51 in three months, $212,954.33 in six months, and $524,534.08 in fourteen months; and

n.    "Our Shopify stores have a proven process and have never lost money."

209.    Upon information and belief, Defendants intentionally and knowingly made the false and misleading statements about the necessary marketing plan and funding necessary and available for the promised Store to succeed:

a.    "Service Provider shall create and execute on behalf of the Business a continuous social media advertising campaign;"

b.    Defendants had an "uncapped" budget of "millions" for the necessary advertising and that would be used for that necessary advertising;

c.    Defendants would be "pumping tons of money into advertising to scale up the store and make it profitable;"

d.    "[O]ur partner Stuart right, the owner of Saddlebrook Investments, he's going to be pumping tons of money into advertising to scale up the store and make it profitable." "Stuart, he's going to invest his money into marketing to get it profitable;"

e.    "We're going to put about $60,000 into your store;"

f.    Defendants have access to revenue from other profitable stores to fuel the profit of the new stores;

g.    Defendants put more money into the store than the investor;

h.    Defendants would spend "thousands and thousands a month" on advertising for the store to reach the profitability numbers; and

i.    Defendant Simonsen would be spending "way more" than $35,000 into each store.

36

210. Upon information and belief, Defendants intentionally and knowingly made the false and misleading statements about the existence of, and alleged track record for creating Shopify stores of a multiple value, and selling Shopify stores created for investors:

    a.    "we have a track record of being able to set up these stores, scale them to $30,000 a month in net profit, in 6 to 9 months, and then putting it into a position to be sold for a 3x return on annual earnings."

    b.    Defendants had never had a store fail or that they gave up on;

    c.    Defendants only sold stores (plural) for more than $1 million;

    d.    That based on their track records, Defendants expected the stores around one year to be worth more than 3x the initial investment, around $1 million;

    e.    "Your Shopify store becomes a valuable asset! It is digital real estate and has a going market value of 4-6x its annual income."

    f.    Defendants had already sold multiple stores for prior investors, typically at a multiple of four to six times the annual profits, which were the profits claimed as their track record;

    g.    Defendants had already sold two hundred stores;

    h.    Defendants ADC and Saddlebrook both had "a proven multiple 6-figure track record;"

    i.    Defendants had alleged sales reports for Shopify stores run through their Shopify Automation program listing total sales of $2,094,570.64 in fourteen months, $6,772,162.11 in fourteen months, $36,849.51 in three months, $212,954.33 in six months, and $524,534.08 in fourteen months; and

    j.    "Our Shopify stores have a proven process and have never lost money."

211. That information and belief is shown and supported by the following information:

    a.    In contrast to their claimed track record and expertise, Defendants do not seem able to create a profitable store for any investor as experienced and communicated by the

investors with each other;

    b.    In contrast to their claimed track record and expertise, Defendants have continually blamed Shopify for an alleged inability to allow the investor ownership of the store or login access to the store;

    c.    Defendants have sent screen captures of alleged data to investors that cannot be examined for accuracy or determination whether it applies to their store;

    d.    Defendants have not shared a working application that allows the investors access to the data for their alleged stores, such as marketing spent, sales, or profits;

    e.    Defendants have asked investors to not share their experiences and information with each other;

    f.    The only information available to investors has shown a few hundred dollars spent on marketing against Defendants' promises to spend thousands each month on each store, from an uncapped marketing budget of "millions;"

    g.    This negligible marketing budget directly contradicts Defendants' claim of cash flow from continually growing stores funding the marketing budget and Defendants' claim of a proven track record, sales of 200 stores, and sales of stores for only in excess of $1 million;

    h.    Products listed for sale on the alleged Shopify stores created for investors appear to be cheap goods from foreign sellers commonly sought out for drop shipping sites that can be created in days for a few hundred dollars;

    i.    Defendants have made illogical excuses for the delay and failures and pointed fingers at each other, and their own agents such as blaming the broker for store failures and claiming store failures because of an alleged 10% draw on store profits;

    j.    These delays and failures come against Defendants' claims that starting these stores is easy, can be done in less than two weeks, all on a proven track record; and

    k.    Defendant Morgan recently confessed that these automation programs do not work and that he has sold businesses that do not even exist.

38

212.    Defendants' misrepresentations to Plaintiffs and the other investors were sufficiently important to induce Plaintiffs and the other investors to enter into the Service Agreements.

213.    At the time that Defendants' made the misrepresentations, Defendants and their agents knew the representations were false.

214.    Defendants made the representations with the intention to induce Plaintiffs and the other investors to pay funds to Defendants.

215.    Plaintiffs and the other investors relied on the alleged truth of the misrepresentations made by Defendants.

216.    Plaintiffs' and the other investors' reliance on Defendants' fraudulent misrepresentations was reasonable and justified under the circumstances.

217.    As a direct and proximate result of the fraudulent misrepresentations made by Defendants to deprive Plaintiffs and other investors of their money, Plaintiffs and the other investors have been damaged.

**COUNT FOUR**
**(A.R.S. § 44-1521, *et seq* – Consumer Fraud)**

218.    Plaintiffs incorporates all previous allegations as if fully stated herein.

219.    The services and alleged Shopify store offered and sold by Defendants constitute merchandise under the Arizona Consumer Fraud Act.

220.    Defendants used deception, a deceptive or unfair act or practice, fraud, false pretenses, false promises, and misrepresentations, and /or concealed, suppressed, or omitted a material fact in relation to the transaction with Plaintiffs and the other investors.

221.    To simultaneously create pressure and comfort to induce these investments, Defendants intentionally made the false statements about the operations, profitability, track record, and value of these Shopify stores were a "guarantee."

39

222.    Upon information and belief, Defendants made the intentionally false statement an investor was going to purchase two-hundred stores and take away this opportunity. That information and belief is based upon Defendants instead continuation of these solicitations and investments up through early this year.

223.    Defendants intentionally made the false and misleading statement they stock these Shopify stores with high-quality goods.

224.    On information and belief, contrary to the promise made to these potential investors to stock the stores with high-quality goods, Defendants have instead run the stores as drop shipping stores. A review of the products allegedly for sale on the websites allegedly created by Defendants demonstrates products for sale on foreign commerce websites with volumes of cheap goods such as AliExpress. [Exhs. 6, 7, 8] That is not a calculated system of high-quality goods. It is part of a standard online scheme pitched for people to create nearly do-nothing Shopify stores that sell cheap goods supplied and shipped by third parties.

225.    Upon information and belief, Defendants intended and knew they were making false and misleading statements that the investors would own the store created for them. Rather, Plaintiffs and other investors demanded login access to the Shopify stores allegedly being created for them. Defendants refused to do so and continued to stonewall and change stories for why they could not do so.

226.    Defendants would instead send pictures of the stores to claim the existence of the stores. That prevented Plaintiffs and the investors any ability to login or corroborate or debunk Defendants' statements.

227.    Defendants later told Plaintiff and other investors that a Shopify rule or policy prevented Defendants from creating the stores in the name of the investor. That directly contradicted Defendants' claim they were creating an ecommerce store to be owned by the investor, and:

    a.    They had allegedly been running this program since 2021;

40

b.    They had allegedly been successfully running this program since 2021;

c.    They had allegedly been running some sixty Shopify stores for investors; and

d.    They had fintech and ecommerce expertise as claimed when they did not understand Shopify rules or policies by their own stories.

228.    Upon information and belief, Defendants intentionally and knowingly made the following false and misleading claims about the timing of the expected sales and profits and Defendants' alleged track record for expected sales and profits:

a.    They guaranteed sales through the store within thirty days;

b.    They had a track record with stores up and loaded with products within one week, testing products for sale within two weeks, and steady sales after 50 to 100 purchases within the first 30 to 45 days;

c.    The store would be profitable within 90 to 120 days;

d.    The stores typically reached $5,000-$6,000 in profits monthly around six months;

e.    The stores typically reached $10,000-$15,000 in profits monthly around nine months;

f.    The stores typically reached $25,000-$30,000 in profits monthly around twelve months;

g.    Defendants had a track record of building the stores to $30,000 in monthly profit in 6 to 9 months;

h.    Defendants had a track record of building the stores to $30,000 in monthly profits in 12 to 18 months;

i.    Defendants, based on a track record, expected for the investor to see a full return on investment in less than one year;

j.    Defendants, based on a track record, were flipping/selling stores based on a multiplier of building these stores to $30,000 in monthly profits;

41

k. Defendants have never had a Shopify store fail or that Defendants gave up on;

l. Defendants ADC and Saddlebrook Investments both had "a proven multiple 6-figure track record;"

m. Defendants had alleged sales reports for Shopify stores run through their Shopify Automation program listing total sales of $2,094,570.64 in fourteen months, $6,772,162.11 in fourteen months, $36,849.51 in three months, $212,954.33 in six months, and $524,534.08 in fourteen months; and

n. "Our Shopify stores have a proven process and have never lost money."

229. Upon information and belief, Defendants intentionally and knowingly made the false and misleading statements about the necessary marketing plan and funding necessary and available for the promised Store to succeed:

a. "Service Provider shall create and execute on behalf of the Business a continuous social media advertising campaign;"

b. Defendants had an "uncapped" budget of "millions" for the necessary advertising and that would be used for that necessary advertising;

c. Defendants would be "pumping tons of money into advertising to scale up the store and make it profitable;"

d. "[O]ur partner Stuart right, the owner of Saddlebrook Investments, he's going to be pumping tons of money into advertising to scale up the store and make it profitable." "Stuart, he's going to invest his money into marketing to get it profitable;"

e. "We're going to put about $60,000 into your store;"

f. Defendants have access to revenue from other profitable stores to fuel the profit of the new stores;

g. Defendants put more money into the store than the investor;

42

h.      Defendants would spend "thousands and thousands a month" on advertising for the store to reach the profitability numbers; and

i.      Defendant Simonsen would be spending "way more" than $35,000 into each store.

230.    Upon information and belief, Defendants intentionally and knowingly made the false and misleading statements about the existence of, and alleged track record for creating Shopify stores of a multiple value, and selling Shopify stores created for investors:

a.      "we have a track record of being able to set up these stores, scale them to $30,000 a month in net profit, in 6 to 9 months, and then putting it into a position to be sold for a 3x return on annual earnings."

b.      Defendants had never had a store fail or that they gave up on;

c.      Defendants only sold stores (plural) for more than $1 million;

d.      That based on their track records, Defendants expected the stores around one year to be worth more than 3x the initial investment, around $1 million;

e.      "Your Shopify store becomes a valuable asset! It is digital real estate and has a going market value of 4-6x its annual income;"

f.      Defendants had already sold multiple stores for prior investors, typically at a multiple of four to six times the annual profits, which were the profits claimed as their track record;

g.      Defendants had already sold two hundred stores;

h.      Defendants ADC and Saddlebrook both had "a proven multiple 6-figure track record;"

i.      Defendants had alleged sales reports for Shopify stores run through their Shopify Automation program listing total sales of $2,094,570.64 in fourteen months, $6,772,162.11 in fourteen months, $36,849.51 in three months, $212,954.33 in six months, and $524,534.08 in fourteen months; and

43

j.      "Our Shopify stores have a proven process and have never lost money."

231.   That information and belief is shown and supported by the following information:

a.      In contrast to their claimed track record and expertise, Defendants do not seem able to create a profitable store for any investor as experienced and communicated by the investors with each other;

b.      In contrast to their claimed track record and expertise, Defendants have continually blamed Shopify for an alleged inability to allow the investor ownership of the store or login access to the store;

c.      Defendants have sent screen captures of alleged data to investors that cannot be examined for accuracy or determination whether it applies to their store;

d.      Defendants have not shared a working application that allows the investors access to the data for their alleged stores, such as marketing spent, sales, or profits;

e.      Defendants have asked investors to not share their experiences and information with each other;

f.      The only information available to investors has shown a few hundred dollars spent on marketing against Defendants' promises to spend thousands each month on each store, from an uncapped marketing budget of "millions;"

g.      This negligible marketing budget directly contradicts Defendants' claim of cash flow from continually growing stores funding the marketing budget and Defendants' claim of a proven track record, sales of 200 stores, and sales of stores for only in excess of $1 million;

h.      Products listed for sale on the alleged Shopify stores created for investors appear to be cheap goods from foreign sellers commonly sought out for drop shipping sites that can be created in days for a few hundred dollars;

i.      Defendants have made illogical excuses for the delay and failures and pointed fingers at each other, and their own agents such as blaming the broker for store failures and claiming store failures because of an alleged 10% draw on store profits;

44

j.      These delays and failures come against Defendants' claims starting these stores is easy, can be done in less than two weeks, all on a proven track record; and

k.      Defendant Morgan recently confessed these automation programs do not work and he has sold businesses that do not even exist.

232.    Defendants intended for Plaintiffs and other investors to rely on these misrepresentations by each paying Defendants $35,000 or more.

233.    As a direct and proximate result of Defendants' actions, Plaintiffs and other investors have been damaged in an amount to be proved at trial, but not less than $50,000 each.

234.    Defendants' actions were willful and in reckless disregard for the rights and interests of Plaintiffs, and Plaintiffs are therefore entitled to an award of punitive damages in an amount to be determined at trial.

235.    Defendants violated the Arizona Consumer Fraud Act in the same manner that it committed fraud above; specifically, by making false representations, inducing Plaintiffs and other investors to rely upon those representations, knowing that the representations were false and knowing that Plaintiffs and other investors would reasonably rely on those false representations to their detriment.

236.    As a direct and proximate result of Defendants' violations of the Arizona Consumer Fraud Act, Plaintiffs and other investors have been damaged and are entitled to all forms of relief affordable thereunder.

**COUNT FIVE**
**(17 C.F.R. § 229.701 – Sale of Unregistered Securities)**

237.    Plaintiffs reincorporate all previous allegations as if fully stated herein.

238.    Federal law prohibits the sale of unregistered securities.

239.    The Agreement is a security under 15 U.S.C. § 77a *et seq*.; 15 U.S.C. § 78 *et. seq.*

240.    Specifically, the Agreement is an investment contract.

241.    Defendants continually referenced these purchasers as "investors" and the Service Agreements as "investments."

242.    Defendants continually referenced this arrangement as one where the "investor" was "passive" and did nothing to receive the profits that would be generated by Defendants' efforts. Defendants advertised that arrangement in the solicitation videos created by Defendants ADC, Morgan, and Mitchell. Casey Cain, acting as alleged Chief Operating Officer for Defendant Saddlebrook also referred to this as a passive "investment."

243.    Defendants operated a system where the investment was funded for continued operation and alleged profitability solely through their efforts and their promised funding of more money than the initial investment.

244.    Defendants acknowledged their funding was allegedly sourced from the profits they allegedly split from the prior investments in these Service Agreements. Defendant Simonsen described it as, "Think about this way. I'll keep piling my cash flows into more advertising for our store, to generate more profit."

245.    Though Defendants claimed the investors owned the Shopify stores, that was not performed and Defendants continually made-up excuses for why that alleged asset ownership did not occur.

246.    The nature of these Shopify stores is such that absent continued and successful advertising, all to be funded by Defendant Saddlebrook, the stores will do little to no business and will not succeed or return the investment.

247.    Defendant Simonsen described and pitched the success of the stores and program to Plaintiff Orzalli as a system where the investors would use profits to purchase more stores and Defendant Saddlebrook would take its share of the profits and reinvest those into the stores to generate more profits, for investors to purchase more stores, and on and on and on.

248.   Plaintiffs and other investors' funds for these investments were pooled and, on information and belief, the alleged profits and liquid funds to be infused into these stores was similarly pooled.

249.   The security offered and sold to Plaintiffs and other investors by Defendants was not registered as required by Arizona law, nor were they exempt securities or sold in an exempt transaction.

250.   Pursuant to A.R.S. § 44-2001(A), Plaintiffs are entitled to rescind the purchase of the unregistered security and recover the purchase price for the same, together with interest, their taxable court costs, and their reasonable attorneys' fees.

251.   Plaintiffs have or will tender the Agreement, which constitutes the security at issue.

### COUNT SIX
### (Rule 10b-5 Fraud in the Sale of Securities)

252.   Plaintiffs reincorporate all previous allegations as if fully stated herein.

253.   Federal law prohibits making a material misstatement or omission with intention to deceive, manipulate, or defraud in the sales of a security.

254.   To simultaneously create pressure and comfort to induce these investments, Defendants intentionally made the false statements about the operations, profitability, track record, and value of these Shopify stores were a "guarantee."

255.   Upon information and belief, Defendants made the intentionally false statement an investor was going to purchase stores and take away this opportunity. That information and belief is based upon Defendants instead continuation of these solicitations and investments up through early this year.

256.   Defendants intentionally made the false and misleading statement they stock these Shopify stores with high-quality goods.

257.   On information and belief, contrary to the promise made to these potential investors to stock the stores with high-quality goods, Defendants have instead run the stores as drop

47

shipping stores. A review of the products allegedly for sale on the websites allegedly created by Defendants demonstrates products for sale on foreign commerce websites with volumes of cheap goods such as AliExpress. [Exhs. 6, 7, 8] That is not a calculated system of high-quality goods. It is part of a standard online scheme pitched for people to create nearly do-nothing Shopify stores that sell cheap goods supplied and shipped by third parties.

258.    Upon information and belief, Defendants intended and knew they were making false and misleading statements the investors would own the store created for them. Rather, Plaintiffs and other investors demanded login access to the Shopify stores allegedly being created for them. Defendants refused to do so and continued to stonewall and change stories for why they could not do so.

259.    Defendants would instead send pictures of the stores to claim the existence of the stores. That prevented Plaintiffs and the investors any ability to login or corroborate or debunk Defendants' statements.

260.    Defendants later told Plaintiffs and other investors a Shopify rule or policy prevented Defendants from creating the stores in the name of the investor. That directly contradicted Defendants' claim they were creating an ecommerce store to be owned by the investor, and:

        a.    They had allegedly been running this program since 2021;

        b.    They had allegedly been successfully running this program since 2021;

        c.    They had allegedly been running some sixty Shopify stores for investors; and

        d.    They had fintech and ecommerce expertise as claimed when they did not understand Shopify rules or policies by their own stories.

261.    Upon information and belief, Defendants intentionally and knowingly made the following false and misleading claims about the timing of the expected sales and profits and Defendants' alleged track record for expected sales and profits:

        a.    They guaranteed sales through the store within thirty days;

b.    They had a track record with stores up and loaded with products within one week, testing products for sale within two weeks, and steady sales after 50 to 100 purchases within the first 30 to 45 days;

c.    The store would be profitable within 90 to 120 days;

d.    The stores typically reached $5,000-$6,000 in profits monthly around six months;

e.    The stores typically reached $10,000-$15,000 in profits monthly around nine months;

f.    The stores typically reached $25,000-$30,000 in profits monthly around twelve months;

g.    Defendants had a track record of building the stores to $30,000 in monthly profit in 6 to 9 months;

h.    Defendants had a track record of building the stores to $30,000 in monthly profits in 12 to 18 months;

i.    Defendants, based on a track record, expected for the investor to see a full return on investment in less than one year;

j.    Defendants, based on a track record, were flipping/selling stores based on a multiplier of building these stores to $30,000 in monthly profits;

k.    Defendants have never had a Shopify store fail or that Defendants gave up on;

l.    Defendants ADC and Saddlebrook Investments both had "a proven multiple 6-figure track record;"

m.    Defendants had alleged sales reports for Shopify stores run through their Shopify Automation program listing total sales of $2,094,570.64 in fourteen months, $6,772,162.11 in fourteen months, $36,849.51 in three months, $212,954.33 in six months, and $524,534.08 in fourteen months; and

49

n.    "Our Shopify stores have a proven process and have never lost money."

262.    Upon information and belief, Defendants intentionally and knowingly made the false and misleading statements about the necessary marketing plan and funding necessary and available for the promised Store to succeed:

a.    "Service Provider shall create and execute on behalf of the Business a continuous social media advertising campaign;"

b.    Defendants had an "uncapped" budget of "millions" for the necessary advertising and that would be used for that necessary advertising;

c.    Defendants would be "pumping tons of money into advertising to scale up the store and make it profitable;"

d.    "[O]ur partner Stuart right, the owner of Saddlebrook Investments, he's going to be pumping tons of money into advertising to scale up the store and make it profitable." "Stuart, he's going to invest his money into marketing to get it profitable;"

e.    "We're going to put about $60,000 into your store;"

f.    Defendants have access to revenue from other profitable stores to fuel the profit of the new stores;

g.    Defendants put more money into the store than the investor;

h.    Defendants would spend "thousands and thousands a month" on advertising for the store to reach the profitability numbers; and

i.    Defendant Simonsen would be spending "way more" than $35,000 into each store.

263.    Upon information and belief, Defendants intentionally and knowingly made the false and misleading statements about the existence of, and alleged track record for creating Shopify stores of a multiple value, and selling Shopify stores created for investors:

a.    "we have a track record of being able to set up these stores, scale them to $30,000 a month in net profit, in 6 to 9 months, and then putting it into a position to be sold for a

1    3x return on annual earnings."

2              b.    Defendants had never had a store fail or that they gave up on;

3              c.    Defendants only sold stores (plural) for more than $1 million;

4              d.    That based on their track records, Defendants expected the stores around one

5    year to be worth more than 3x the initial investment, around $1 million;

6              e.    "Your Shopify store becomes a valuable asset! It is digital real estate and has

7    a going market value of 4-6x its annual income;"

8              f.    Defendants had already sold multiple stores for prior investors, typically at

9    a multiple of four to six times the annual profits, which were the profits claimed as their track

10    record;

11              g.    Defendants had already sold two hundred stores;

12              h.    Defendants ADC and Saddlebrook Investments both had "a proven multiple

13    6-figure track record;"

14              i.    Defendants had alleged sales reports for Shopify stores run through their

15    Shopify Automation program listing total sales of $2,094,570.64 in fourteen months,

16    $6,772,162.11 in fourteen months, $36,849.51 in three months, $212,954.33 in six months, and

17    $524,534.08 in fourteen months; and

18              j.    "Our Shopify stores have a proven process and have never lost money."

19        264.    That information and belief is shown and supported by the following information:

20              a.    In contrast to their claimed track record and expertise, Defendants do not

21    seem able to create a profitable store for any investor as experienced and communicated by the

22    investors with each other;

23              b.    In contrast to their claimed track record and expertise, Defendants have

24    continually blamed Shopify for an alleged inability to allow the investor ownership of the store

25    or login access to the store;

26              c.    Defendants have sent screen captures of alleged data to investors that cannot

51

be examined for accuracy or determination whether it applies to their store;

   d. Defendants have not shared a working application that allows the investors access to the data for their alleged stores, such as marketing spent, sales, or profits;

   e. Defendants have asked investors to not share their experiences and information with each other;

   f. The only information available to investors has shown a few hundred dollars spent on marketing against Defendants' promises to spend thousands each month on each store, from an uncapped marketing budget of "millions;"

   g. This negligible marketing budget directly contradicts Defendants' claim of cash flow from continually growing stores funding the marketing budget and Defendants' claim of a proven track record, sales of 200 stores, and sales of stores for only in excess of $1 million;

   h. Products listed for sale on the alleged Shopify stores created for investors appear to be cheap goods from foreign sellers commonly sought out for drop shipping sites that can be created in days for a few hundred dollars;

   i. Defendants have made illogical excuses for the delay and failures and pointed fingers at each other, and their own agents such as blaming the broker for store failures and claiming store failures because of an alleged 10% draw on store profits;

   j. These delays and failures come against Defendants' claims that starting these stores is easy, can be done in less than two weeks, all on a proven track record; and

   k. Defendant Morgan recently confessed these automation programs do not work and he has sold businesses that do not even exist.

  265. Plaintiffs and other investors relied on these statements and were persuaded to make these investments based upon Defendants' statements as outlined herein.

  266. This Court is authorized to direct the reimbursement of all consideration paid by Plaintiffs and the other investors for these securities, to recission of the transactions induced by Defendants' violations of Rule 10b-5, and to other money damages.

**COUNT SEVEN**

**(A.R.S. § 44-1842 – Sale of Securities by Unregistered Dealers and Salesman)**

267.    Plaintiffs reincorporate all previous allegations as if fully stated herein.

268.    Arizona law prohibits the sale of securities by anyone other than salesmen properly registered with the State of Arizona.

269.    In doing the things alleged herein, Defendants acted as "dealers" within the meaning of § 44-1801(10).

270.    At all times relevant hereto, Defendants were not registered to sell securities as required by Arizona Law.

271.    Pursuant to A.R.S. § 44-2002(A), Plaintiffs are entitled to rescind the purchase of the unregistered security and recover the purchase price for the same, together with interest, his taxable court costs, and his reasonable attorneys' fees.

**COUNT EIGHT**

**(A.R.S. § 44-1991 – Fraud in the Sale of Securities)**

272.    Plaintiffs reincorporate all previous allegations as if fully stated herein.

273.    Arizona law prohibits the use of any "device, scheme or artifice to defraud," the use of "any untrue statement of material fact, or omi[ssion] to state any material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading," and the "engage[ment] in any transaction, proactive or course of business which operations would operate as fraud or deceit" in connection with the sale of securities.

274.     To simultaneously create pressure and comfort to induce these investments, Defendants intentionally made the false statements about the operations, profitability, track record, and value of these Shopify stores were a "guarantee."

275.    Upon information and belief, Defendants made the intentionally false statement an investor was going to purchase two-hundred stores and take away this opportunity. That

information and belief is based upon Defendants instead continuation of these solicitations and investments up through early this year.

276.    Defendants intentionally made the false and misleading statement they stock these Shopify stores with high-quality goods.

277.    On information and belief, contrary to the promise made to these potential investors to stock the stores with high-quality goods, Defendants have instead run the stores as drop shipping stores. A review of the products allegedly for sale on the websites allegedly created by Defendants demonstrates products for sale on foreign commerce websites with volumes of cheap goods such as AliExpress. [Exhs. 6, 7, 8] That is not a calculated system of high-quality goods. It is part of a standard online scheme pitched for people to create nearly do-nothing Shopify stores that sell cheap goods supplied and shipped by third parties.

278.    Upon information and belief, Defendants intended and knew they were making false and misleading statements the investors would own the store created for them. Rather, Plaintiffs and other investors demanded login access to the Shopify stores allegedly being created for them. Defendants refused to do so and continued to stonewall and change stories for why they could not do so.

279.    Defendants would instead send pictures of the stores to claim the existence of the stores. That prevented Plaintiffs and the investors any ability to login or corroborate or debunk Defendants' statements.

280.    Defendants later told Plaintiff and other investors a Shopify rule or policy prevented Defendants from creating the stores in the name of the investor. That directly contradicted Defendants' claim that they were creating an ecommerce store to be owned by the investor, and:

        a.     They had allegedly been running this program since 2021;

        b.     They had allegedly been successfully running this program since 2021;

        c.     They had allegedly been running some sixty Shopify stores for investors; and

54

d.      They had fintech and ecommerce expertise as claimed when they did not understand Shopify rules or policies by their own stories.

281.   Upon information and belief, Defendants intentionally and knowingly made the following false and misleading claims about the timing of the expected sales and profits and Defendants' alleged track record for expected sales and profits:

a.      They guaranteed sales through the store within thirty days;

b.      They had a track record with stores up and loaded with products within one week, testing products for sale within two weeks, and steady sales after 50 to 100 purchases within the first 30 to 45 days;

c.      The store would be profitable within 90 to 120 days;

d.      The stores typically reached $5,000-$6,000 in profits monthly around six months;

e.      The stores typically reached $10,000-$15,000 in profits monthly around nine months;

f.      The stores typically reached $25,000-$30,000 in profits monthly around twelve months;

g.      Defendants had a track record of building the stores to $30,000 in monthly profit in 6 to 9 months;

h.      Defendants had a track record of building the stores to $30,000 in monthly profits in 12 to 18 months;

i.      Defendants, based on a track record, expected for the investor to see a full return on investment in less than one year;

j.      Defendants, based on a track record, were flipping/selling stores based on a multiplier of building these stores to $30,000 in monthly profits;

k.      Defendants have never had a Shopify store fail or that Defendants gave up on;

55

l.     Defendants ADC and Saddlebrook both had "a proven multiple 6-figure track record;"

m.     Defendants had alleged sales reports for Shopify stores run through their Shopify Automation program listing total sales of $2,094,570.64 in fourteen months, $6,772,162.11 in fourteen months, $36,849.51 in three months, $212,954.33 in six months, and $524,534.08 in fourteen months; and

n.     "Our Shopify stores have a proven process and have never lost money."

282.   Upon information and belief, Defendants intentionally and knowingly made the false and misleading statements about the necessary marketing plan and funding necessary and available for the promised Store to succeed:

a.     "Service Provider shall create and execute on behalf of the Business a continuous social media advertising campaign;"

b.     Defendants had an "uncapped" budget of "millions" for the necessary advertising and that would be used for that necessary advertising;

c.     Defendants would be "pumping tons of money into advertising to scale up the store and make it profitable;"

d.     "[O]ur partner Stuart right, the owner of Saddlebrook Investments, he's going to be pumping tons of money into advertising to scale up the store and make it profitable." "Stuart, he's going to invest his money into marketing to get it profitable;"

e.     "We're going to put about $60,000 into your store;"

f.     Defendants have access to revenue from other profitable stores to fuel the profit of the new stores;

g.     Defendants put more money into the store than the investor;

h.     Defendants would spend "thousands and thousands a month" on advertising for the store to reach the profitability numbers; and

i.    Defendant Simonsen would be spending "way more" than $35,000 into each store.

283.    Upon information and belief, Defendants intentionally and knowingly made the false and misleading statements about the existence of, and alleged track record for creating Shopify stores of a multiple value, and selling Shopify stores created for investors:

a.    "we have a track record of being able to set up these stores, scale them to $30,000 a month in net profit, in 6 to 9 months, and then putting it into a position to be sold for a 3x return on annual earnings."

b.    Defendants had never had a store fail or that they gave up on;

c.    Defendants only sold stores (plural) for more than $1 million;

d.    That based on their track records, Defendants expected the stores around one year to be worth more than 3x the initial investment, around $1 million;

e.    "Your Shopify store becomes a valuable asset! It is digital real estate and has a going market value of 4-6x its annual income."

f.    Defendants had already sold multiple stores for prior investors, typically at a multiple of four to six times the annual profits, which were the profits claimed as their track record;

g.    Defendants had already sold two hundred stores;

h.    Defendants ADC and Saddlebrook both had "a proven multiple 6-figure track record;"

i.    Defendants had alleged sales reports for Shopify stores run through their Shopify Automation program listing total sales of $2,094,570.64 in fourteen months, $6,772,162.11 in fourteen months, $36,849.51 in three months, $212,954.33 in six months, and $524,534.08 in fourteen months; and

j.    "Our Shopify stores have a proven process and have never lost money."

284.    That information and belief is shown and supported by the following information:

57

       a.     In contrast to their claimed track record and expertise, Defendants do not seem able to create a profitable store for any investor as experienced and communicated by the investors with each other;

       b.     In contrast to their claimed track record and expertise, Defendants have continually blamed Shopify for an alleged inability to allow the investor ownership of the store or login access to the store;

       c.     Defendants have sent screen captures of alleged data to investors that cannot be examined for accuracy or determination whether it applies to their store;

       d.     Defendants have not shared a working application that allows the investors access to the data for their alleged stores, such as marketing spent, sales, or profits;

       e.     Defendants have asked investors to not share their experiences and information with each other;

       f.     The only information available to investors has shown a few hundred dollars spent on marketing against Defendants' promises to spend thousands each month on each store, from an uncapped marketing budget of "millions;"

       g.     This negligible marketing budget directly contradicts Defendants' claim of cash flow from continually growing stores funding the marketing budget and Defendants' claim of a proven track record, sales of 200 stores, and sales of stores for only in excess of $1 million;

       h.     Products listed for sale on the alleged Shopify stores created for investors appear to be cheap goods from foreign sellers commonly sought out for drop shipping sites that can be created in days for a few hundred dollars;

       i.     Defendants have made illogical excuses for the delay and failures and pointed fingers at each other, and their own agents such as blaming the broker for store failures and claiming store failures because of an alleged 10% draw on store profits;

       j.     These delays and failures come against Defendants' claims that starting these stores is easy, can be done in less than two weeks, all on a proven track record; and

k.    Defendant Morgan recently confessed these automation programs do not work and he has sold businesses that do not even exist.

285.    Plaintiffs and other investors relied on these statements and were persuaded to make these investments based upon Defendants' statements as outlined herein.

286.    In doing the things alleged herein, Defendants used a "device, scheme or artifice to defraud" Plaintiffs, made material misrepresentations and omitted material facts necessary to make their representations not misleading, and engaged in practices which are fraudulent and deceitful.

287.    Pursuant to A.R.S. § 44-2002(A), Plaintiffs are entitled to rescind the purchase of the unregistered security and recover the purchase price for the same, together with interest, their taxable court costs, and his reasonable attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand and pray for judgment against all Defendants, jointly and severally, as follows:

(A)    Awarding judgment in Plaintiffs' favor and against Defendants;

(B)    Awarding Plaintiffs their damages as proven at trial;

(C)    Awarding Plaintiffs their costs of suit, reasonable attorneys' fees and pre-judgment and post-judgment interest;

(D)    Awarding Plaintiffs punitive damages in an amount to be determined by the finder of fact;

(E)    Awarding Plaintiffs increased statutory damages provided by the Arizona Consumer Fraud Act;

(F)    Awarding Plaintiffs additional attorneys' fees and costs against Defendants in the amount of $3,000 in the event of default;

(G)    Awarding Plaintiffs attorneys' fees and costs for collection after entry of Judgment upon application to the Court; and

1      (H)    Awarding Plaintiffs such further relief as this Court deems just and proper.

2    DATED this 13th day of June 2023.

3

4                                    DESSAULES LAW GROUP

5                                    By:    /s/ David E. Wood

6                                        Jonathan A. Dessaules
                                         David E. Wood
7                                        *Attorneys for Plaintiffs*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26