Jonathan A. Dessaules (019439)
David E. Wood (021403)
**DESSAULES LAW GROUP**
7243 North 16th Street
Phoenix, Arizona 85020
602.274.5400 tel.
602.274.5401 fax
jdessaules@dessauleslaw.com
dwood@dessauleslaw.com

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Cameron Threadgill; Oliver Christy; and Jake Orzalli,<br><br>Plaintiffs,<br><br>vs.<br><br>Saddlebrook Investments, LLC, a Montana limited liability company; Stuart Simonsen and Doe Simonsen; All Done Consulting, LLC, a Minnesota limited liability company; Ryan Morgan and Doe Morgan; and Jeff Mitchell,<br><br>Defendants. | No. 2:23-cv-01089-DJH<br><br>**MOTION FOR ENTRY OF DEFAULT JUDGMENT** |

**MOTION**

Plaintiffs move this Court to enter a Default Judgment against Defendants Ryan Morgan and his company All Done Consulting ("ADC"). Defendants defrauded each Plaintiff out of $35,000 for a passive investment that they supposedly had successfully run for dozens of other investors to make millions of dollars. That was false and Defendants ignored and refused Plaintiffs' demands for the "buy back" provision in these investment contracts for the return of their $35,000 investment funds.

All other defendants in this matter settled and are no longer part of this case. To avoid confusion or conflict between federal and state law for the requested judgment, Plaintiffs are moving this Court for a Default Judgment of only the pendant state law claims.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.  PROCEDURAL BACKGROUND.**

This is an action for a fraud scheme perpetrated by Defendants that amounted to common law Fraud, statutory consumer fraud in violation of Arizona statutes, and both Sale of Unregistered Securities and Securities Fraud in violation of 17 C.F.R. 229.701 and Rule 10b-5. The Complaint (Doc. 1) was filed on June 13, 2023. The Defendants were personally served by process server on June 22, 2023, and Certificates of Service were filed on June 28, 2023 (Docs. 7-8). No response or answer was filed, and Plaintiffs filed an Application and Affidavit for Entry of Default on July 17, 2023 (Doc. 14). The Clerk of Court entered default on July 18, 2023 (Doc. 17). The Defendants were served the application to the Clerk to enter default. (Doc. 14)

**II.  A DEFAULT JUDGMENT IS WARRANTED BASED ON THE DETAILED, UNCONTESTED COMPLAINT AND DEFENDANTS' RETENTION OF FUNDS PROCURED BY FRAUD.**

Plaintiffs request the entry of default judgment by the Court pursuant to Rule 55(b)(2). The bulk of awardable damages are easily quantified. Each of the three individual plaintiffs were induced by false statements to enter into investment contracts for alleged creation and running of Shopify stores that proved to be, at best, a useless debacle. Each of the three individual plaintiffs paid defendants $35,000 as induced by that fraud. They did not receive any of the promised return or a return of their investments.

When reviewing a motion for default judgment where no Answer was filed, the factual allegations in the Complaint are taken as true. Fed. R. Civ. P. 8(b)(6); *Geddes v. United Fin. Grp.*, 559 F.2d 557, 560 (9th Cir. 1977). The sole exception is proof of the amount of damages. Default judgments are appropriate and routine where the amount of the damages and financial aspects of the judgment are certain.

To determine whether a default judgment is appropriate, courts in this Circuit apply and analyze factors set forth in *Eitel v. McCool*, 782 F.2d 1470, 1471 (9th Cir. 1986).[1] Analysis of the Complaint and the *Eitel* factors demonstrate that a default judgment for the fully calculable damages, prejudgment interest, and reasonable attorneys' fees and costs is appropriate and necessary.

**(1)     The Possibility of Prejudice to the Plaintiffs.**

Prejudice is established by two factors. Though Plaintiffs settled with other Defendants in this matter, settlements are a compromise. In contrast, Plaintiffs have a substantive right to prejudgment interest for their claims. Plaintiffs also are prejudiced by Defendants Morgan and ADC remaining enriched by the retention of any portion of the obtained fraudulent investments against their full recovery.

**(2)     The Merits of Plaintiffs' Substantive Claim and the Sufficiency of the Complaint.**

The Complaint was drafted with supporting exhibits and details to comply with the heightened pleading requirements of the PSLRA. 15 U.S.C.A. § 78u-4(b); *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 321 (2007). The Complaint identifies the incredible litany of false and misleading statements Defendants published for all Plaintiffs and potential investors on web pages and posted internet videos, along with the specific false and misleading statements made to each Plaintiff personally. The Complaint further details all the failings, coverups and admissions of the Defendants evidencing that they procured these investments with false statements from inception of a guaranteed, fully functioning investment vehicle to be funded by Defendants' stream of millions of dollars that had allegedly exploded into a track record of

---

[1] The Honorable Jennifer A. Dorsey recently observed "In cases like this one, in which the defendants have not participated in the litigation, the first, fifth, sixth, and seventh *Eitel* factors are easily satisfied." *Sternquist v. Humble Hearts LLC*, No. 219CV00448JADBNW, 2021 WL 3134902, at *2 (D. Nev. July 23, 2021).

$200,000,000 in identical investment contracts sold due to Defendants' unique management and expertise.

Because the requested Default Judgment includes several claims with the identical element that Defendants made false and misleading statements to solicit investment funds, Plaintiffs are identifying those statements and their materiality below in the outline of the common law fraud claim and the facts admitted by Defendants' default. In the outline of additional claims, Plaintiffs will refer back to that long list of statements to avoid repetition.

Because Defendants defaulted, the following factual allegations are admitted. Defendants Morgan and ADC acted in concert with the original defendants, Stuart Simonsen, Saddlebrook Investments, and Jeff Mitchell. [Compl ¶13.] Defendants Morgan and ADC solicited funds for contracts titled as "Service Agreements" to fund, create, and run for passive investors online stores hosted on the Shopify platform to be owned by the investors. Defendant ADC was the listed "Broker" responsible for "the initial sale, ongoing client support, profit distributions and servicing any client needs within a reasonable timeframe." [Id. ¶17]

Defendants repeatedly outlined this investment as entirely "passive." [*Id.* ¶¶ 36, 64, 107, 242] "You sit back and collect the checks." [*Id.* ¶ 36] "WE WE DO ALL OF THE WORK FOR YOU!" [*Id.* ¶ 64] In the solicitation video hosted on Defendant ADC's website, Defendant Morgan confirmed again the investors did nothing with the running of the Shopify store, and the running of the store would be performed by Defendants' team. [*Id.* ¶¶ 37-38] Plaintiffs, who Defendants referred to as "investors," were contractually forbidden from materially participating in the creation, advertising and marketing, fulfillment, and financial management of the Store. "Client shall not control the details, manner, or means by which Service Provider performs the Services in any material respect." [*Id*. ¶ 18]

Defendants are not registered with FINRA or the State of Arizona as securities salesmen. [*Id*. ¶ 24] Defendants did not register the Service Agreements with either the SEC or the State of Arizona as securities for offering and sale. [*Id*.]

To solicit these investments, Defendants made the following materially false statements:

- They guaranteed sales through the store within thirty days;
- They had a track record with stores up and loaded with products within one week, testing products for sale within two weeks, and steady sales after 50 to 100 purchases within the first 30 to 45 days;
- The store would be profitable within 90 to 120 days;
- The stores typically reached $5,000-$6,000 in profits monthly around six months;
- The stores typically reached $10,000-$15,000 in profits monthly around nine months;
- The stores typically reached $25,000-$30,000 in profits monthly around twelve months;
- Defendants had a track record of building the stores to $30,000 in monthly profit in 6 to 9 months;
- Defendants had a track record of building the stores to $30,000 in monthly profits in 12 to 18 months;
- Defendants, based on a track record, expected for the investor to see a full return on investment in less than one year;
- Defendants, based on a track record, were flipping/selling stores based on a multiplier of building these stores to $30,000 in monthly profits;
- Defendants never had a Shopify store fail or that Defendants gave up on;
- Defendants ADC and Saddlebrook both had "a proven multiple 6-figure track record;"
- Defendants had alleged sales reports for Shopify stores run through their Shopify Automation program listing total sales of $2,094,570.64 in fourteen months, $6,772,162.11 in fourteen months, $36,849.51 in three months, $212,954.33 in six months, and $524,534.08 in fourteen months; and
- "Our Shopify stores have a proven process and have never lost money."

[*Id.* ¶ 158]

Defendants intentionally and knowingly made the following false and misleading statements:

- "Service Provider shall create and execute on behalf of the Business a continuous social media advertising campaign;"
- Defendants had an "uncapped" budget of "millions" for the necessary advertising and that would be used for that necessary advertising;
- Defendants would be "pumping tons of money into advertising to scale up the store and make it profitable;"
- "[O]ur partner Stuart right, the owner of Saddlebrook Investments, he's going to be pumping tons of money into advertising to scale up the store and make it profitable." "Stuart, he's going to invest his money into marketing to get it profitable;"
- "We're going to put about $60,000 into your store;"
- Defendants have access to revenue from other profitable stores to fuel the profit of the new stores;
- Defendants put more money into the store than the investor;
- Defendants would spend "thousands and thousands a month" on advertising for the store to reach the profitability numbers;
- Defendant Simonsen would be spending "way more" than $35,000 into each store;
- "We have a track record of being able to set up these stores, scale them to $30,000 a month in net profit, in 6 to 9 months, and then putting it into a position to be sold for a 3x return on annual earnings;"
- Defendants had never had a store fail or that they gave up on;
- Defendants only sold stores (plural) for more than $1 million;
- That based on their track records, Defendants expected the stores around one year to be worth more than 3x the initial investment, around $1 million;

- "Your Shopify store becomes a valuable asset! It is digital real estate and has a going market value of 4-6x its annual income;"
- Defendants had already sold multiple stores for prior investors, typically at a multiple of four to six times the annual profits, which were the profits claimed as their track record;
- Defendants had already sold two hundred stores; and
- Defendants ADC and Saddlebrook both had "a proven multiple 6-figure track record." "Our Shopify stores have a proven process and have never lost money."

[*Id*. ¶ 159-160]

Plaintiffs reasonably relied on these statements to invest $35,000 each with Defendants and entered the service agreement contracts. Against and in contrast to Defendants' material statements, Plaintiffs were never given access to their alleged stores, and were only providing pictures that could not be authenticated. Defendants spent a few hundred dollars on advertising. Defendants struggled for months to create the alleged stores, in contrast to their claimed ongoing investment vehicle with a proven track record of $1 million value per store, with allegedly 200 stores sold at or above that price. Plaintiff Threadgill was part of a text message thread with other investors. Everyone confirmed that the stores did not operate as advertised, that they never received any profits, and that Defendants refused their demand for refunds. [*Id*. ¶ 131]

Defendant Morgan eventually confessed that the automation program does not actually work. [*Id*. ¶ 75] He also posted a video stating that he has sold businesses that do not exist. [*Id*. ¶ 161]

### a) Counts One and Two – Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing

Defendants induced these investments with written investment contracts that contained a term providing for a Buy Back to be paid by Defendant ADC. That term used to induce Plaintiffs stated that Plaintiffs could receive back their investment funds within the first twelve months of

the investment. Plaintiffs demanded those refunds. Defendants never complied. Defendants breached the investment contracts and covenant of good faith and fair dealing.

### b) Count Three – Fraud

Defendants engaged in common law fraud of Plaintiffs. A claim of common law fraud contains nine elements: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent that it be acted upon by the recipient in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) the listener's reliance on its truth; (8) the right to rely on it; and (9) the listener's consequent and proximate injury. *Wells Fargo Credit Corp. v. Smith*, 166 Ariz. 489, 494 (Ct. App. 1990)

As recited above, Defendants made a long list of materially false representations all part of solicitations for investors to give them money. Those statements were necessarily made with the intent for the listener to rely upon; they were solicitations of investments based upon the promise of hundreds of thousands of dollars in profits. Specifically, Defendants made false statements of a track record of successfully building two hundred other Shopify stores, all valued and sold at a minimum of $1,000,000 based upon their annual profits, that Defendants uniquely succeeded in doing so because they invested more than $35,000 into each store to advertise and generate sales, that these investments were "guaranteed," and that they were profitable within months based upon a proven track record of sales and profits.

Plaintiffs relied upon those statements to make the investments and could not know of their falsity. They ended with alleged stores that took months to create, a couple hundred dollars in ads, and non-compliance with the Buy Back provision that they relied upon for complete safety in making the investments. They never received a penny in profit.

The admitted facts establish a common law fraud against these Plaintiffs.

### c) Count Four – Consumer Fraud

The Arizona Consumer Fraud Act authorizes a private cause of action. *Dunlap v. Jimmy GMC of Tucson, Inc.*, 136 Ariz. 338, 342 (Ct. App. 1983). The elements of that action "are a false

promise or misrepresentation made in connection with the sale or advertisement of merchandise and the hearer's consequent and proximate injury." *Id.*

These investment contracts are "merchandise" that fall within the Arizona Consumer Fraud Act. "Merchandise" includes "any objects, wares, goods, commodities, intangibles, real estate or services." By the terms of the investment contracts and Defendants' solicitations, they were creating and building Shopify Stores for the investor. Those were goods and commodities. They also were providing the exclusive "services" of designing and operating those stores.

As recited above, Defendants made a long list of intentional and knowing falsehoods and misrepresentations to advertise and sell those service contracts. Plaintiffs relied upon those falsehoods and misrepresentations to end with nothing. Defendants violated the consumer fraud statutes.

    **d)**    **Counts Seven and Eight – Sale of Unregistered Securities and Fraud in the Sale of Securities**

Defendants are not registered salesmen of securities. Such registration is required by Arizona statute for anyone to offer securities for sale from or within Arizona on behalf of an issuer. Defendants Morgan and ADC conducted these solicitations and offers from Scottsdale, Arizona on behalf of Defendant Saddlebrook and themselves.

These service agreements were investment contracts and unregistered securities. Arizona applies the federal definition and guidance from *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) to analyze whether a contract is an investment contract falling under the Arizona Securities Act's definition of a security at A.R.S. § 44-1801(27). *Siporin v. Carrington*, 200 Ariz. 97, 101 ¶¶ 19-20 (Ct. App. 2001). Those typical factors are: (1) an investment of money, (2) in a common enterprise, (3) with an expectation of profits from the efforts of others, and when those other-party efforts "are 'the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise.'" *Id.* (*quoting Nutek Info. Sys., Inc. v. ACC*, 194 Ariz. 104, 108 ¶ 18 (Ct. App. 1998)). Courts analyze the substance of the contracts rather than the form.

*Nutek*, 194 Ariz. at 108 ¶ 17. This is so because the definition of a security is meant to be broad and flexible "to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Id*. (*quoting Howey*, 328 U.S. at 299).

Courts analyzing contracts for partnership or joint ventures consider many factors to find that they are in fact unregistered investment contracts under the third factor. Arizona courts have identified as nonexclusive factors for that analysis:

> (1) an agreement among the parties leaves so little power in the hands of the partner or venturer that the arrangement in fact distributes power as would a limited partnership; or
>
> (2) the partner or venturer is so inexperienced and unknowledgeable in business affairs that he is incapable of intelligently exercising his partnership or venture powers; or
>
> (3) the partner or venturer is so dependent on some unique entrepreneurial or managerial ability of the promoter or manager that he cannot replace the manager of the enterprise or otherwise exercise meaningful partnership or venture powers.

<u>*Nutek*</u>, 194 Ariz. 109 ¶ 20 (*quoting Williamson v. Tucker*, 645 F.2d 404, 424 (5th Cir.1981)). Those factors are not viewed in isolation. In *Nutek*, the Arizona Court of Appeals upheld the finding that LLC membership shares were unregistered securities because the contracts "prevented members from exercising control over the LLCs." *Id*. ¶ 21. The Court upheld analysis reviewing the practical control of the investors based on analysis of the promotional material and oral presentations made by the promoters. *Id*. ¶ 22.

Defendants sought the investment of money from Plaintiffs and others. They identified their targets as "investors" and the scheme as an "investment." This was a common enterprise by several markers. They advertised the investment as a joint venture or partnership with them whereby they would profit share an online store that Defendants would create and independently operate for the investor. They advertised that they would invest more money into the store than

the investor, and that the pool of money for the injected money derived from the profits of other stores with other investors. Because this was an alleged profit-sharing arrangement where Defendants' success depended on the investors' success in developing a profitable store, all parties had a direct correlation between each other's success. That is vertical commonality and a common enterprise. "Vertical commonality requires a direct correlation between the success of the investor and the success of the promoter without a pooling of funds." *Foy v. Thorp*, 186 Ariz. 151, 158 (Ct. App. 1996).

The possibility of profit and success was exclusively controlled by Defendants. By contract, Defendants barred Plaintiffs and all other investors from any control of the store. Instead, Defendants vested that absolute control with the parties soliciting that money. The expectation of profit by both contractual design and Defendants' solicitations was to be entirely derived from the efforts of Defendants. Defendants solicited these investments as entirely "passive" where the investor would sit back and collect the checks because Defendants would do the work for them. By operation, Defendants in fact barred Plaintiffs from most of the promised information and ability to examine the operation of the store entirely operated by Defendants but allegedly owned by Plaintiffs.

In committing those unlawful sales, Defendants also committed securities fraud in violation of Arizona statute by making untrue statements of material fact. A claim for violation of Arizona's securities fraud statute requires proof that the defendant through either direct or indirect actions engaged in any one of the following elements:

1. Employ any device, scheme or artifice to defraud.
2. Make any untrue statement of material fact, or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.
3. Engage in any transaction, practice or course of business which operates or would operate as a fraud or deceit.

11

A.R.S. § 44-1991.

The burden of proof for securities fraud is only that the statements were material and misleading. *Aaron v. Fromkin*, 196 Ariz. 224, 227 ¶¶ 14-15 (Ct. App. 2000). Arizona's element regarding untrue or omitted statements of material facts is an element of that statement or omission "would have assumed actual significance in the deliberations of the reasonable buyer," without a requirement of the same to the specific plaintiff. *Id*. Arizona's security fraud statute does not require proof of the speaker's knowledge of the falsity of the statements. *Id*.

As recited above, Defendants made materially false statements about a track record of creating at least 200 Shopify stores, reaching profit and sales margins within months, building the annual profits to create a store value of $1,000,000, and doing so by investing their own funds in excess of $35,000 for the advertising necessary to reach those allegedly routine benchmarks. Any objective, potential investor would rely upon those claimed facts about operations and success.

By Arizona definition, Defendants sold securities in the form of investment contracts. They were not registered to do so. In soliciting and making those sales, Defendants made a lengthy list of materially false and misleading statements that an objective investor would rely upon. Both the sales and falsehood independently violated Arizona statutes, A.R.S. §§ 44-1842; -1991. Plaintiffs are entitled to an award of the consideration paid, plus interest, taxable court costs and their reasonable attorneys' fees. A.R.S. § 44-2001.

**(3)    The Sum of Money at Stake in the Action.**

Each Plaintiff in this matter was defrauded a sum certain of $35,000, for damages of those exact amounts. The requested damages are directly proportionate to the amount that Defendants solicited and obtained from them. *Gemmel v. Systemhouse, Inc.*, No. CIV 04-198-TUC-CKJ, 2008 WL 65604, at *5 (D. Ariz. Jan. 3, 2008). This sum certain is appropriate for default judgment.

**(4)  The Possibility of a Dispute Concerning Material Facts.**

Though served the detailed Complaint, Defendants did not Answer, thereby admitting the detailed factual allegations in the Complaint save for damages. Defendants have not appeared or made any attempt to dispute the factual allegations. There is no possible factual dispute.

**(5)  Whether the Default was Due to Excusable Neglect.**

Defendants were personally served the detailed Complaint and Summons, and thereafter separately served the Application for Default. They did not appear, answer, or contact Plaintiffs' counsel. This is not excusable neglect.

**(6)  The Strong Policy Underlying the Federal Rules of Civil Procedure Favoring Decisions on the Merits.**

Courts in this Circuit observe that the existence of Federal Rule of Civil Procedure 55 demonstrates that a stated policy favoring decisions on the merits, standing alone, does not preclude a default judgment. *Frenchans LLC v. Vestige LLC*, No. CV-22-00241-PHX-JZB, 2023 WL 3951172, at *2 (D. Ariz. Apr. 17, 2023); *PepsiCo, Inc. v. California Sec. Cans*, 238 F. Supp. 2d 1172, 1177 (C.D. Cal. 2002). Because Defendants chose not to appear or Answer, a decision on the merits is nearly impossible for these Plaintiffs. *Frenchans*, 2023 WL 3951172, at *6. This is a matter where Defendants are uniquely in possession of the additional information regarding the proven true failures to perform or act as they promised with this guaranteed, passive investment. Defendants chose not to appear or Answer.

**III.  PLAINTIFFS ARE ENTITLED TO $35,000 EACH IN ACTUAL DAMAGES, PREJUDGMENT INTEREST, THEIR REASONABLE ATTORNEYS' FEES AND COSTS, AND A JUDGMENT WITH POST JUDGMENT INTEREST.**

The monetary amounts for the requested Default Judgment are certain. Each Plaintiff invested $35,000 into Defendants' investment vehicle. That is supported by the Plaintiffs' certifications to the Complaint and the amounts recited in the service agreements attached to the Complaint at exhibits 1 through 3. Those are the damages for a breach of contract, common law fraud, and the statutory damages for violating the Arizona Securities Act.

13

### A. Prejudgment Interest should be awarded from December 1, 2022.

"It is well settled that prejudgment interest is a substantive aspect of a plaintiff's claim, rather than a merely procedural mechanism." *In re Exxon Valdez*, 484 F.3d 1098, 1101 (9th Cir. 2007). Under Arizona law, "pre-judgment interest on a liquidated claim is a matter of right." *AMHS Ins. Co. v. Mut. Ins. Co. of Arizona*, 258 F.3d 1090, 1103 (9th Cir. 2001). A claim is liquidated if "the evidence furnishes data which, if believed, makes it possible to compute the amount with exactness, without reliance upon opinion or discretion." *MBP Collection LLC v. Everest Nat'l Ins. Co.*, No. CV-17-04022-PHX-GMS, 2020 WL 4692463, at *2–3 (D. Ariz. Jan. 27, 2020) (*quoting Homes & Son Const. Co. v. Bolo Corp.*, 22 Ariz. App. 303, 306 (1974)). Under the Arizona Securities Act, interest is a right for a liquidated claim without the need for a demand. *Trimble v. Am. Sav. Life Ins. Co.*, 152 Ariz. 548, 559 (Ct. App. 1986).

In this matter, the Defendants from inception of the investments failed to provide the services due to all Plaintiffs that they supposedly supplied to dozens of other investors to make millions of dollars, evidencing also that the solicitation statements were false. Plaintiffs began their money demands for the fully calculated sum of their original $35,000 investments in December 1, 2022 and reiterated those demands through 2023, including in April 2023. [Comp. ¶¶ 163, 166, 167, 185] The owed debt was fully calculable and known ("liquidated") from at least December 1, 2022 for Defendants Morgan and ADC to rely upon.

Under A.R.S. § 44-1201, pre-judgment interest accrues at 10% per annum for a judgment to collect an "indebtedness." *Arizona State Univ. Bd. of Regents v. Arizona State Ret. Sys.*, 242 Ariz. 387, 389 (Ct. App. 2017). This Court should award prejudgment interest on the $35,000 in damages to each Plaintiff calculated at a $9.58 ($35,000 x .1 ÷ 365) per diem rate from December 1, 2022 through the entry of judgment.

### B. Plaintiffs Should Receive an Award of Their Reasonable Attorneys' Fees.

The investment contracts, attached as Exhibit 1 to the Complaint, provide that the prevailing party in a dispute over the contract "shall be" awarded his or her reasonable attorneys' fees. (Doc. 001-2, at pages 8, 16, 24) Arizona statute provides for an award of attorneys' fees for an action arising from contract and for violation of Arizona's Securities Act. A.R.S. §§ 12-341.01; 44-2001. Arizona statutes provide for an award of all "costs expended" for contract violations and "taxable costs" for violation of Arizona's Securities Act. A.R.S. §§ 12-341.01; 44-2001. This Court should award Plaintiffs their reasonable attorneys' fees and costs, which are the subject of a separately filed application.

### IV. CONCLUSION.

For the reasons stated herein judgment should be entered in the principal amounts of $35,000 in damages awarded to each individual Plaintiff. The judgment should include as to each individual Plaintiff's damages an award of prejudgment interest beginning on December 1, 2022 calculated at $9.58 per day. The judgment should include post-judgment interest as set forth in 28 U.S.C. § 1961. The judgment should also award Plaintiffs an award of reasonable attorneys' fees and costs incurred in bringing this action. A proposed judgment is being submitted herewith.

DATED this 29th day of September 2023.

DESSAULES LAW GROUP


By: /s/ David E. Wood
    Jonathan A. Dessaules
    David E. Wood
    *Attorneys for Plaintiffs*

# **CERTIFICATE OF SERVICE**

I hereby certify that on September 29, 2023 I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and for transmittal of Notice of Electronic Filing to the CM/ECF registrants.

I further certify that I have mailed and emailed a copy of the foregoing document to the following Non-CM/ECF registrants:

| | |
|---|---|
| Ryan Morgan<br>6815 E. Camelback Rd., Unit 3003<br>Scottsdale, Arizona 85251<br>Ryan@alldoneconsulting.com<br>Ryan@franchisefundraisers.com<br>*Defendant* | All Done Consulting, LLC<br>c/o Ryan Morgan<br>6815 E. Camelback Rd., Unit 3003<br>Scottsdale, Arizona 85251<br>Ryan@alldoneconsulting.com<br>Ryan@franchisefundraisers.com<br>*Defendant* |

By: /s/ Lisa M. Lopez